UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | NO. H-85-1078(PCD) |
| v. | ) | |
| | ) | |
| 43.47 ACRES OF LAND, MORE OR LESS, | ) | |
| SITUATED IN THE COUNTY OF | ) | |
| LITCHFIELD, TOWN OF KENT, et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | * * * * * * * * * |
| SCHAGHTICOKE TRIBAL NATION | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | NO. 3-98-CV 01113 (PCD) |
| v. | ) | |
| | ) | |
| KENT SCHOOL CORPORATION, INC., et | ) | |
| al | ) | |
| Defendants. | ) | |
| | ) | * * * * * * * * * |
| SCHAGHTICOKE TRIBAL NATION | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | NO. 3-00-CV 0820 (PCD) |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA AND | ) | |
| THE CONNECTICUT LIGHT AND | ) | |
| POWER COMPANY, et al | ) | |
| Defendants. | ) | March 23, 2005 |

**SCHAGHTICOKE TRIBAL NATION'S REPLY TO STATE OF CONNECTICUT'S,
KENT SCHOOL'S AND THE CONNECTICUT LIGHT & POWER COMPANY'S
OPPOSITION TO ITS MOTION FOR PERMISSION
TO CONDUCT LIMITED DISCOVERY**

## Introduction

Pursuant to Rule 7(d) of the Local Rules of Civil Procedure, the Schaghticoke Tribal

Nation ("Tribe") submits this reply brief to the State of Connecticut's, Kent School's and The

Connecticut Light & Power Company's (collectively, the "Respondents") opposition brief, dated March 9, 2005, to the Tribe's Motion for Permission to Conduct Limited Discovery.[1]

The Respondents obfuscate the issues in a futile attempt to prevent the Tribe and the Court from determining whether some of the defendants, indirectly through TASK or otherwise, violated the Court's Order by contacting Department of Interior (DOI) officials without prior notice. The Respondents essentially acknowledge that the Tribe's discovery request is warranted to determine if such violations have occurred, but the Respondents request reciprocal discovery concerning their allegations that the Tribe may have violated the Court's Order throughout the federal recognition process. While the Tribe's request is supported by foundational evidence demonstrating that violations may have occurred, the Respondents' request is not. If the Respondents can produce such evidence, the Tribe will have no problem with their request for discovery. Further, while the Respondents acknowledge that they have no involvement with TASK or its affiliates, they ignore the evidence as against some of the other defendants indicating that their conduct may have violated the Order. Instead, the Respondents divert the Court's attention with allegations against the Tribe without one scintilla of foundational evidence to support them. The Respondents essentially use their qualified objection not as a sword to discover the truth, but as a shield. In any event, the Respondents' allegations are without merit.[2]

The Respondents first posit that the Tribe may have violated the Court Order by contacting DOI officials because the DOI issued a Final Determination on January 29, 2004 giving the Tribe federal recognition only after it issued a December 5, 2002 proposed negative

---

[1]  It should be noted that the Town of Kent filed a separate opposition brief from the Respondents for purposes of the Tribe's Motion.

[2]  The Tribe need not address all of the inaccuracies of the State's allegations. The failure to do so, however, should not be viewed as acquiesce in their veracity.

finding.  There is not one bit of evidence demonstrating or even inferring such contact.  If a

potential violation of the Court Order had occurred that was the impetus of DOI's change in

position, the Respondents would surely have raised this issue in court or otherwise during that

time period or immediately after January 29, 2004.  Also, the Court Order to which the

Respondents agreed allowed the parties and *amici* an opportunity to submit comments,

information, documents, analysis or argument on the proposed finding.  See ¶ (f), May 8, 2001

Court Order.  In accordance with the Court Order, the parties, including the Respondents and the

Tribe, commented on the proposed finding and submitted evidence concerning their respective

positions.  It is not unprecedented for the DOI to change a negative  proposed finding to a

positive final determination.[3]   In fact, by regulation, the agency is required to provide technical

assistance to assist the petitioner in preparing documentation and explanation to overcome a

negative proposed finding.  See 25 C.F.R. § 83.10(j)(i) (requiring the Assistant Secretary to

provide petitioner with "any records used for the proposed finding" and to provide technical

assistance, including suggestions as to how to best respond to that proposed finding").[4]   Now,

after the Tribe completed the daunting recognition process, the Respondents seek not only to

discredit but to override the very procedure it previously endorsed.

---

[3] See, e.g., Mohegan Indian Tribe of Connecticut (positive final determination published in 59
Fed. Reg. 12140 (1994), after the petitioner provided sufficient evidence to overcome the
negative proposed finding issued in 54 Fed. Reg. 47136 (1989)); Samish Indian Tribe (positive
final determination published in 52 Fed. Reg. 3709 (1987) which reversed the negative proposed
finding that was published in  47 Fed. Reg. 50110 (1982)); Wampanoag Tribal Council of Gay
Head (positive final determination published in 52 Fed. Reg. 4193 (1987), one year after a
negative proposed finding issued in 51 Fed. Reg. 23504 (1986)).

[4] The regulations also require the agency to provide formal technical assistance to interested
parties to allow them to "inquir[e] into the reasoning, analyses, and factual bases for the
proposed finding." 25 C.F.R. §83.10(j)2).  The interested parties challenging the Schaghticoke
Tribal Nation's petition for acknowledgment requested and received such formal technical
assistance from the agency.

The Respondents also claim that the Tribe may have violated the Court Order because it had a relationship with financial investors and that they hired lobbyists or other representatives to represent the Tribe's interests in Washington, D.C.. In particular, the Respondents reference the hiring of Paul J. Manafort and rely heavily on a February 8, 2004 news article concerning the same. Their speculation is misplaced. As acknowledged by the Respondents, the article reported that Richard Velky, the chief of the Tribe, stated that Manafort had been hired as an attorney for the Tribe's legal team, not a lobbyist.[5] Nonetheless, the Respondents' interpretation of the article is that the Tribe may have somehow violated the Court Order by having lobbyists or other representatives contact DOI officials. Such a tortured interpretation of the article is baseless.

Further, as indicated in footnote 1 of its Motion, the Tribe's lobbying efforts have not violated the Court Order. To reiterate, although the Tribe has hired representatives in the past to monitor proposed legislation in Washington D.C. concerning Native American issues, the Tribe has discontinued their services with regard to the Department of Interior once the Court Order was in place.

Based on nothing more than conjecture, the Respondents attempt to divert the Court's attention from substantial evidence that demonstrates that some of the other defendants may have violated the Court Order by indirectly or otherwise contacting DOI officials. The Respondents

---

[5]   Also, the Respondents have ignored the results of a thorough investigation that the Office of the Inspector General (OIG) conducted. It concluded that there was "no evidence to support the allegation that lobbyists or representatives for [the Tribe] directly or indirectly influenced BIA officials to grant Federal acknowledgment to [the Tribe]. Inspector General Earl Devaney, Memorandum to Interior Secretary Norton, with attachment, August 27, 2004. Attached as Exhibit A.

simply ignore that evidence, which demonstrates that some of the defendants may be undermining the very recognition process that the parties had negotiated for and agreed to years ago and that is a central focus of these consolidated cases.

It seems obvious that some of the Tribe's opponents will use any means to undermine that process. Not only have congressional representatives directly communicated with the agency board handling the appeal, (Exhibit F attached to Tribe's Motion), but most recently Rep. Nancy Johnson has introduced proposed legislation to repeal what she calls the "unlawful and erroneous decision of the Bureau of Indian Affairs." H.R. __ , "A Bill to Repeal the Federal Recognition of the Schaghticoke Tribal Nation," March 4, 2005, Section 2(b)(2). Attached as Exhibit B. Therefore, the Tribe's Motion for Permission to Conduct Limited Discovery should be allowed and the Respondents' request for reciprocal discovery should be denied.

THE PLAINTIFF,
SCHAGHTICOKE TRIBAL NATION
BY MCCARTER & ENGLISH, LLC
ITS ATTORNEYS

By _____
Eric Watt Wiechmann (CT 04331)
Salvatore N. Fornaciari (CT 22684)
CityPlace I
Hartford, CT 06103
(860) 275-6700

Of Counsel:
Judith A. Shapiro, Esq.
6856 Eastern Avenue NW
Suite 206
Washington, DC 20012

and

Jerry C. Straus, Esq.
Hobbs, Straus, Dean & Walker, LLP
2120 L Street, NW
Washington, DC  20037

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing Schaghticoke Tribal Nation's Reply Brief has been mailed, postage prepaid this 23rd of March, 2005 to:

John B. Hughes, Esq.
Chief of Civil Division
United States Attorneys Office
157 Church Street, Floor 23
New Haven, CT 06510

Judith A. Shapiro, Esq.
6856 Eastern Avenue NW, Suite 206
Washington, DC 20012

David J. Elliot, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT 06103-3499

Loretta Bonos
594 Bendview Drive
Charleston, WV 25314

Jeffrey B. Sienkiewicz, Esq.
Sienkiewicz & McKenna, PC
9 South Main Street
P.O. Box 786
New Milford, CT 06776-0786

Michael J. Burns, Esq.
Law Offices of Attorney Michael J. Burns
57 Pratt Street
Hartford, CT 06103

Jerry C. Straus, Esq.
Hobbs, Straus, Dean & Walker, LLP
2120 L Street, NW
Washington, DC 20037

Giovanna Tiberii Weller, Esq.
Carmody & Torrance
50 Leavenworth Street
P.O. Box 1110
Waterbury, CT 06721-1110

Robert A. Slavitt, Esq.
Slavitt, Connery, & Vardamis
618 West Avenue
Norwalk, CT 06850

James R. Fogarty, Esq.
Fogarty Cohen Selby & Nemiroff
88 Field Point Road, P.O. Box 2508
Greenwich, CT 06836-2508

Susan Quinn Cobb, Esq.
Asst. Attorney General
55 Elm Street
Hartford, CT 06141

Thomas A. Gugliotti, Esq.
Updike, Kelly & Spellacy
One State Street
Hartford, CT 06123

Renita Ford, Esq.
General Litigation Section
Environmental & Natural Resources Division
United States Department of Justice
Post Office Box 663
Washington, DC 20004-0663

Scott Keep, Esq.
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW
Mailstop 6456
Washington, D.C. 20240

Salvatore N. Fornaciari (CT 22684)

HARTFORD: 635410.02

# EXHIBIT

# A



# United States Department of the Interior

### OFFICE OF INSPECTOR GENERAL
#### Washington, DC 20240

AUG 17 2004

Memorandum

To:         Secretary

From:       Earl E. Devaney
            Inspector General

Subject:    Results of OIG Investigation – Federal Acknowledgment of Schaghticoke Tribal
            Nation

     In response to your memorandum of March 31, 2004, regarding the Federal acknowledgment of the Schaghticoke Tribal Nation (STN), I am attaching a copy of my letter to Senator Christopher Dodd. An identical letter was sent to Senator Joseph Lieberman, Congressmen Christopher Shays, Rob Simmons and John Larson, and Congresswomen Nancy Johnson and Rosa DeLauro.

     In summary, our investigation found that the regulatory acknowledgment process was followed, and that no outside influence or personal bias affected the decision to grant acknowledgment to the STN. The rationale contained in the Office of Federal Acknowledgement (OFA) briefing paper and the decision of the Principal Deputy Assistant Secretary – Indian Affairs to rely on that rationale in her decision is pending before the Interior Board of Indian Appeals, the appropriate tribunal for administrative adjudication in this matter.

     On May 5, 2004, in testimony before the House Committee on Government Reform concerning the tribal acknowledgment process at the Department, I commended the process as one of the more transparent ones in DOI, especially after several recent changes to the program. If, as we found in the STN matter, the Department follows the well-established statutory and regulatory requirements – which include notice, opportunity to comment, and an appeal or review mechanism – acknowledgment decisions rendered by the Department will always be buttressed by the administrative process. If, however, established requirements are not followed – whether related to tribal acknowledgment or other matters before the Department – decisions become vulnerable to attack and can lead to an erosion of public confidence.

     Although the STN acknowledgment decision was highly controversial, we found that OFA and the Principal Deputy Assistant Secretary – Indian Affairs conducted themselves in keeping with the requirements of the administrative process, their decision-making process was made transparent by the administrative record, and those parties aggrieved by the decision have sought relief in the appropriate administrative forum – each, as it should be.

     If you have any questions or concerns about this matter, please do not hesitate to contact me at (202) 208-5745.

Attachment



## United States Department of the Interior

### OFFICE OF INSPECTOR GENERAL
Washington, DC 20240

AUG 27 2004

Honorable Christopher Dodd
United States Senate
Washington, D.C.   20510-0702

Dear Senator Dodd:

This is in response to your March 12, 2004 letter in which you requested the Office of Inspector General (OIG) to conduct an investigation into the process associated with the Bureau of Indian Affairs' (BIA) Final Determination decision of Federal acknowledgment as an Indian tribe to a group known as the Schaghticoke Tribal Nation (STN).  Your letter referred to allegations in a March 12, 2004 article in the *Hartford Courant*, which criticized the acknowledgment because the group allegedly did not meet all of the mandatory criteria for Federal acknowledgment.  In response to your letter, the OIG initiated an investigation.  Subsequently, the OIG received a request from the Secretary of the Interior, Gale A. Norton, asking the OIG to give this matter high priority, given its importance and the concerns raised.

The newspaper article alleged that (1) BIA "bent the rules" to grant acknowledgment to the STN; (2) BIA's Office of Federal Acknowledgment (OFA) authored a briefing paper explaining how the STN's petition could be approved; (3) STN supporters influenced BIA officials to award acknowledgment to STN; and (4) an OFA employee had a personal bias against the Connecticut Attorney General's Office that may have influenced the review and acknowledgment process.  We reviewed thousands of documents related to the STN petition and interviewed the senior Department of the Interior (DOI) officials involved in the acknowledgment process, officials representing the State of Connecticut and affected Connecticut towns, STN leaders, and supporters of the STN in the Federal acknowledgement process.

### Background

In connection with a lawsuit against Connecticut for 900 acres of land adjoining the STN reservation, STN filed a petition for Federal acknowledgment as an Indian tribe with BIA.  In May 2001, the U.S. District Court with jurisdiction over the lawsuit issued a court-approved negotiated scheduling order that addressed the group's land claim issue and resolution of the group's recognition status.  The group failed to submit adequate documentation to BIA by the court-imposed deadline, and on December 5, 2002, BIA issued its Proposed Finding denying Federal acknowledgment.  Subsequent to the issuance of the Proposed Finding, during the comment period, the group submitted additional information to BIA for consideration.  With the additional information, BIA issued its Final Determination acknowledging the STN as a Federally recognized tribe on January 29, 2004.

## Investigative Findings

### Allegation that BIA "bent the rules"

The *Hartford Courant* article alleged that BIA "bent the rules" by granting STN Federal acknowledgment. On December 5, 2002, the former Assistant Secretary – Indian Affairs issued a Proposed Finding that denied STN Federal acknowledgment because the group failed to meet the requirements of the Code of Federal Regulations (CFR) Title 25, Chapter 1, Part 83, "Procedures for Establishing that an American Indian Group Exists as an Indian Tribe." The Proposed Finding stated that STN did not meet two out of the seven mandatory criteria for obtaining Federal acknowledgment. Specifically, STN did not demonstrate the *continual existence of a distinct community* from 1940 to 1967 and from 1996 to the present, and STN did not *maintain political authority and influence* for specific time periods from 1801 to present.

After the Proposed Finding was issued, the regulations provide for a period in which the petitioner and third parties may submit comments and additional information to BIA. During the comment period, STN did submit additional information to address these two criteria, which was considered by BIA in issuing its Final Determination.

On January 29, 2004, the Principal Deputy Assistant Secretary – Indian Affairs issued a Final Determination acknowledging the STN as a federally recognized tribe. The Final Determination stated that the additional information submitted by STN provided sufficient evidence to meet the requirements of the two criteria that had been lacking. The regulations, as written, are permissive and inherently flexible, and therefore afford latitude in the evidence used and considered to support Federal acknowledgment.

Whether or not the Principal Deputy Assistant Secretary – Indian Affairs acted within her regulatory discretion is not for the OIG to decide. Rather, we note that this matter is on appeal before the appropriate administrative tribunal, the Interior Board of Indian Appeals, which has jurisdiction to adjudicate this issue.

### Allegation that briefing paper is a "smoking gun"

An OFA briefing paper, which was contained in the administrative record, was described as a "smoking gun" in various news articles. A team of OFA employees (a historian, a genealogist, and a cultural anthropologist) was responsible for reviewing STN's application for Federal acknowledgement and preparing the briefing paper for the Principal Deputy Assistant Secretary – Indian Affairs to assist her in making a decision regarding STN's acknowledgment. The options contained in the briefing paper were discussed in a meeting among the OFA team members, the Principal Deputy Assistant Secretary – Indian Affairs, and an attorney from the Office of Solicitor. Our investigation determined that the team prepared the briefing paper with knowledge that it would be subject to full public disclosure and part of the STN administrative record.

### Allegation that STN representatives influenced BIA officials

Our investigation found no evidence to support the allegation that lobbyists or representatives for STN directly or indirectly influenced BIA officials to grant Federal

acknowledgment to STN. Interviews with STN's leader and council representatives disclosed that the Federal acknowledgment process cost the group approximately $12 million. In pursuing its land claim, the group incurred even more costs.

In order to cover these costs, the group sought supporters and ultimately secured several financial backers, including Frederick A. DeLuca, founder of the *Subway* restaurant chain and a member of a small investment group known as the Eastlander Group in Hartford, CT. The Eastlander Group employs Paul Manafort as a consultant who facilitates communications between Eastlander and the STN. Mr. Manafort was reported in at least one article as having lobbied DOI on behalf of STN.

The Eastlander Group's managing director told us that no one from the Eastlander Group had contacted DOI employees regarding STN's Federal acknowledgment. Mr. Manafort also told us he had no contact with DOI regarding STN's Federal acknowledgment. The DOI employees we interviewed also denied having been contacted by any STN lobbyist about the STN Federal acknowledgment petition, and our investigation found no independent evidence of any contact.

<u>Allegation of personal bias against the Connecticut Attorney General</u>

Finally, we addressed the allegation that an OFA employee had a personal bias toward the Connecticut Attorney General that may have influenced the review and Federal acknowledgment process. Representatives of the Town of Kent, CT, referred to e-mails in the administrative record authored by one of the OFA staff as evidence of personal bias. Using the Federal Acknowledgement Information Resource database for the STN petition, we searched for and identified 114 e-mails in the STN administrative record. We reviewed each e-mail, regardless of author and found none that could be construed as showing a personal bias toward the Attorney General.

Although the STN recognition decision was highly controversial, we found that OFA and the Principal Deputy Assistant Secretary – Indian Affairs conducted themselves in keeping with the requirements of the administrative process; their decision-making process was made transparent by the administrative record, and those parties aggrieved by the decision have sought relief in the appropriate administrative forum – each, as it should be. Therefore, we are closing this matter.

If you have any questions or additional concerns, please do not hesitate to contact me at (202) 208-5745.

Sincerely,

Earl E. Devaney
Inspector General

# EXHIBIT

# B

.................................................................

(Original Signature of Member)

109TH CONGRESS
1ST SESSION

# H. R. _____

To repeal the Federal acknowledgment of the Schaghticoke Tribal Nation.

---

## IN THE HOUSE OF REPRESENTATIVES

Mrs. JOHNSON of Connecticut introduced the following bill; which was referred
to the Committee on _____

---

# A BILL

To repeal the Federal acknowledgment of the Schaghticoke
Tribal Nation.

1    *Be it enacted by the Senate and House of Representa-*
2    *tives of the United States of America in Congress assembled,*
3    **SECTION 1. SHORT TITLE.**
4        This Act may be cited as the "Schaghticoke Acknowl-
5    edgment Repeal Act of 2005".
6    **SEC. 2. REPEAL OF THE FEDERAL ACKNOWLEDGMENT OF**
7            **THE SCHAGHTICOKE TRIBAL NATION.**
8        (a) FINDINGS.—Congress finds the following:

2

1       (1) The Bureau of Indian Affairs should ac-
2   knowledge petitioning groups as Indian tribes within
3   the meaning of Federal law only when petitioning
4   groups fully, faithfully, and objectively satisfy each
5   of the 7 mandatory acknowledgment criteria under
6   25 CFR § 83.7.

7       (2) The Bureau of Indian Affairs issued a Pro-
8   posed Finding, a preliminary decision, dated Decem-
9   ber 2, 2002, and published in the Federal Register
10   on December 11, 2002 (67 Fed. Reg. 76184), that
11   declined to acknowledge the Schaghticoke Tribal Na-
12   tion as an Indian tribe within the meaning of Fed-
13   eral law because the tribe did not satisfy each of the
14   7 mandatory criteria under section 83.7 of title 25,
15   Code of Federal Regulations, more particularly:

16       (A) The Proposed Finding concluded that
17   the Schaghticoke Tribal Nation did not satisfy
18   criterion 83.7(b), the demonstration of a contin-
19   uous community from the first sustained histor-
20   ical contact to the present, because there was
21   "insufficient evidence" to demonstrate that a
22   community existed for 36 years from 1940 to
23   1967 and from 1996 to the present.

24       (B) The Proposed Finding concluded that
25   the Schaghticoke Tribal Nation did not satisfy

3

1    criterion 83.7(c), the demonstration of contin-

2    uous political authority and influence within the

3    community, because there was "insufficient evi-

4    dence" or "no specific evidence" or both to

5    demonstrate that political authority and influ-

6    ence was exercised within the community for

7    165 years from 1801 to 1875, 1885 to 1967,

8    and 1996 to the present.

9        (C) The Proposed Finding concluded fur-

10   ther concerning criterion 83.7(c) that the State

11   of Connecticut's continuous relationship with

12   individuals claiming to be Schaghticoke and liv-

13   ing on land set aside for them as a reservation

14   did not provide additional evidence during those

15   periods when there was an absence of specific

16   evidence of the exercise of political influence

17   within the group within the meaning of the ac-

18   knowledgment regulations.

19       (D) The Proposed Finding raised concerns

20   that the Schaghticoke Tribal Nation's member-

21   ship list excluded prominent individuals who

22   had been ousted from or refused to be a part

23   of the Schaghticoke Tribal Nation petition, in-

24   cluding members of the rival Schaghticoke In-

25   dian Tribe, members of the Coggswell family,

4

1    and former Chief Irving Harris. In addition, the

2    membership list included newly recruited Jo-

3    seph D. Kilson descendents who had not had

4    any connection with the Schaghticoke group

5    throughout the 20th century.

6        (3) After further public comment and submis-

7    sions by the petitioner and interested parties, the

8    Bureau of Indian Affairs issued a Final Determina-

9    tion, dated January 29, 2004 and published in the

10   Federal Register on February 5, 2004 (69 Fed. Reg.

11   5570), that acknowledged the Schaghticoke Tribal

12   Nation as an Indian tribe within the meaning of

13   Federal law.

14       (4) The Final Determination reached this posi-

15   tive result only through the following:

16          (A) Explicit, premeditated manipulation of

17      both the evidence and established acknowledg-

18      ment standards, as evidenced by the following:

19             (i) In a briefing paper dated January

20         12, 2004, prepared by the Office of Fed-

21         eral Acknowledgment and submitted to

22         Principal Deputy Assistant Secretary-In-

23         dian Affairs Aurene Martin regarding the

24         forthcoming Final Determination, the Of-

25         fice of Federal Acknowledgment requested

5

1    guidance from the Principal Deputy Assist-

2    ant Secretary-Indian Affairs on whether

3    the Schaghticoke Tribal Nation should be

4    "acknowledged even though evidence of po-

5    litical influence and authority is absent or

6    insufficient for two substantial historical

7    periods, and if so, on what grounds?".

8        (ii) In the briefing paper, Office of

9    Federal Acknowledgment staff rec-

10   ommended, and the Principal Deputy As-

11   sistant Secretary-Indian Affairs endorsed,

12   an analytic approach that explicitly dis-

13   carded prior agency precedent and regula-

14   tions governing the acknowledgment proc-

15   ess to overcome the absence and insuffi-

16   ciency of evidence to demonstrate contin-

17   uous political influence and authority, as

18   the regulations require.

19       (iii) This approach, according to the

20   briefing paper, "would require a change in

21   how continuous state recognition with a

22   reservation was treated as evidence.".

23       (iv) The briefing paper also acknowl-

24   edged the possibility of declining acknowl-

25   edgment of the Schaghticoke Tribal Na-

6

1    tion, saying that option "maintains the

2    current interpretations of the regulations

3    and established precedents concerning how

4    continuous tribal existence is dem-

5    onstrated.".

6    (B) Ignoring agency admissions that "in-

7    sufficient direct evidence" or "little or no direct

8    evidence" exists to satisfy the political authority

9    criterion for a period of 118 years, as evidenced

10    by the following:

11    (i) The Bureau of Indian Affairs ad-

12    mits in the Final Determination that

13    "there is little or no direct evidence to

14    demonstrate political influence within the

15    Schaghticoke between 1892 and 1936,"

16    and elsewhere that "there is insufficient di-

17    rect evidence to demonstrate criterion 83.7

18    (c) between 1892 and 1936.".

19    (ii) The Bureau of Indian Affairs ad-

20    mits in the final determination that "there

21    remains little direct evidence concerning

22    political authority or influence among the

23    schaghticoke for this time period [1801–

24    1875]".

7

1      (iii) The Bureau of Indian Affairs admits in a January 12, 2004, briefing paper prepared for the Principal Deputy Assistant Secretary-Indian Affairs that "evidence of political influence and authority [within the Schaghticoke Tribal Nation] is absent or insufficient for two substantial historical periods."

(C) An arbitrary reevaluation and erroneous interpretation of the State's relationship with the Schaghticoke, where the Bureau of Indian Affairs overturned longstanding judicial precedent and interpretation that it repeatedly relied upon in prior acknowledgment decisions involving New England Indian groups, as evidenced by the following:

(i) The Final Determination acknowledged that in using the State's relationship with the group as evidence to satisfy the political community and authority criteria, the Bureau of Indian Affairs was reversing its holding in the Proposed Finding, which stated that "a continuous state relationship with a reservation did not provide additional evidence during those periods

8

1    when there was an absence of specific evi-

2    dence of the exercise of political influence

3    within the group within the meaning of the

4    acknowledgment regulations.".

5        (ii) To reach the positive result in the

6    Final Determination, the Bureau of Indian

7    Affairs erroneously equated the fact that

8    the State of Connecticut had set aside

9    tracts of land where individuals claiming

10   descent from a tribe that existed in colo-

11   nial times could live, including providing

12   funds and an overseer for these individ-

13   uals, with the act of recognizing a sov-

14   ereign entity that has existed as a distinct

15   political community as it is understood

16   under Federal law.

17       (iii) The Bureau of Indian Affairs

18   used this faulty analysis to fill gaps where,

19   by the agency's admission, "insufficient"

20   or "little or no direct" evidence existed to

21   demonstrate continuous community and

22   political authority.

23       (iv) The use of the State's relation-

24   ship with the Schaghticoke group as evi-

25   dence of continuous political authority spe-

9

cifically subverts the intent of the regula-
tions, since the Bureau of Indian Affairs
previously considered and rejected the use
of such arrangements as evidence because
it merely emphasized Indian ancestry, not
the existence of tribal political authority.

(v) In the Final Determination ac-
knowledging the Mohegan tribe in Con-
necticut, the Bureau of Indian Affairs
properly interpreted State recognition, de-
claring that "State recognition is one form
of evidence that a group meets criterion
(a), but it is not grounds for automatically
considering a group to be entitled to Fed-
eral recognition.". In addition, the Bureau
of Indian Affairs adhered to this precedent
and interpretation of a State relationship
in its proposed findings and final deter-
minations concerning the Narrangansett
tribe in Rhode Island, the Gay Head
Wampanoag tribe in Massachusetts, and
the Historic Eastern Pequot and the Gold-
en Hill Paugussett tribes in Connecticut.

(vi) Without the Bureau of Indian Af-
fairs' use of this erroneous interpretation

10

1    of the State's relationship with the
2    Schaghticoke group to substitute for "in-
3    sufficient" or absent evidence necessary to
4    satisfy the continuous community and po-
5    litical authority criteria, the Schaghticoke
6    Tribal Nation would not have satisfied
7    these mandatory criteria and would have
8    been denied acknowledgment.

9    (D) Unprecedented and inaccurate meth-
10   ods to calculate tribal marriage rates, without
11   which the Schaghticoke Tribal Nation would
12   not have reached the 50 percent intra-marriage
13   rate threshold and consequently would not have
14   satisfied the criteria for political authority for a
15   74 year period from 1801 to 1875, as evidenced
16   by the following:

17       (i) Under section 83.7(c)(3) of title
18   25, Code of Federal Regulations, (com-
19   monly known as the so-called "carry-over"
20   provision), in the absence of direct evi-
21   dence, a petitioner can satisfy the political
22   authority criterion for a particular period
23   if it demonstrates one of that "at least 50
24   percent of the marriages in the group are
25   between members of the group," a thresh-

11

1       old that demonstrates community for a

2       particular period under section

3       83.7(b)(2)(ii) of title 25, Code of Federal

4       Regulations.

5          (ii) Because the Bureau of Indian Af-

6       fairs admits in the Final Determination

7       that "there remains little direct evidence

8       concerning political authority or influence

9       among the Schaghticoke for this time pe-

10      riod [1801 to 1875]," the agency invoked

11      the carry-over provision to demonstrate po-

12      litical authority for this period because it

13      calculated that more than 50 percent of

14      the marriages in the group were between

15      members of the group.

16          (iii) In a filing before the Interior

17      Board of Indian Appeals, dated December

18      2, 2004, the Office of the Solicitor, Bureau

19      of Indian Affairs, admitted that the Final

20      Determination used a methodology in cal-

21      culating and analyzing marriage rates that

22      "is not consistent with prior precedent in

23      calculating rates of marriages under

24      83.7(b)(2)(ii) and provides no explanation

25      for the inconsistency.".

12

(iv) The Office of the Solicitor states that "previous acknowledgment decisions interpret 83.7(b)(2)(ii) to require that 50 percent of the marriages are between members of the group. In contrast, the Summary on [Schaghticoke Tribal Nation] inadvertently relied on the number of members of the group who married other members, which results in a higher count.".

(v) The Office of the Solicitor also concludes that mathematical errors were made in tabulating marriage rates in the Final Determination that when corrected reduces the rate below 50 percent, regardless whether "marriages" as is customary, or "members of the group who marry other members," which is unprecedented, is counted.

(vii) Since the Schaghticoke Tribal Nation marriage rates do not meet the 50 percent threshold, the carry-over provision is rendered inoperative.

(viii) Without the carry-over provision to substitute for insufficient evidence to demonstrate political authority for the time

13

1    period from 1801 to 1875, the political au-
2    thority criterion is not satisfied, and the
3    Bureau of Indian Affairs should have de-
4    clined Federal acknowledgment in the
5    Final Determination.

6        (ix) The Office of the Solicitor further
7    advises that during the Interior Board of
8    Indian Appeals request for reconsideration
9    currently under way, the Final Determina-
10   tion "should not be affirmed on these
11   grounds absent explanation or new evi-
12   dence.".

13   (E) A fraudulent membership list for the
14   Schaghticoke Tribal Nation, without which the
15   Schaghticoke group could not be acknowl-
16   edged—a result the Office of Federal Acknowl-
17   edgment within the Bureau of Indian Affairs
18   calls "undesirable" in internal briefing papers,
19   as evidenced by the following:

20       (i) The Schaghticoke group has expe-
21   rienced intense factional conflict for many
22   years, with the resulting split in the early
23   1990s between the Schaghticoke Tribal
24   Nation and the Schaghticoke Indian Tribe

14

1    into two distinct groups with district com-

2    munities and political processes.

3    (ii) The January 12, 2004, briefing

4    paper prepared by Office of Federal Ac-

5    knowledgment staff for the Principal Dep-

6    uty   Assistant   Secretary-Indian   Affairs

7    states the "Schaghticoke Tribal Nation

8    membership list did not include a substan-

9    tial portion of the actual social and polit-

10   ical community.".

11   (iii) The briefing paper concludes that

12   "the activities of these individuals were an

13   essential part of the evidence for the [Pro-

14   posed   Findings]   conclusion   that   the

15   [Schaghticoke Tribal Nation] met criterion

16   83.7(b) [community] and 83.7(c) [political

17   authority] from1967 to 1996 and their ab-

18   sence was one of the reasons the [Proposed

19   Finding] concluded these criteria were not

20   met from 1996 to the present. After 1996,

21   these individuals either declined to reenroll

22   as the leadership required of all members,

23   or subsequently relinquished membership,

24   because of strong political difference with

15

1     the current [Schaghticoke Tribal Nation]

2     administration".

3         (iv) In response to concerns raised in

4     the Proposed Finding, the Schaghticoke

5     Tribal Nation unsuccessfully attempted to

6     purge the Kilson descendents from the

7     membership list and to persuade promi-

8     nent Schaghticokes, including Schaghticoke

9     Indian Tribe members, the Coggswells and

10     Irving Harris, to rejoin.

11         (v) On September 27, 2003, the day

12     before the end of the Schaghticoke Tribal

13     Nation's comment period prior to the

14     issuance of the Final Determination, 15

15     Schaghticoke Indian Tribe members ap-

16     plied for and were granted membership in

17     the Schaghticoke Tribal Nation. Nine of

18     those 15 signed a letter on September 29,

19     2003, however, stating that they were not

20     Schaghticoke Tribal Nation members, had

21     no intention of becoming members, and

22     that "[their] signatures were obtained by

23     fraud".

24         (vi) In the briefing paper, Office of

25     Federal Acknowledgment staff expresses

16

1    disappointment that these irregularities

2    could undermine the Schaghticoke Tribal

3    Nation's goals, saying "the current status

4    of a long-term pattern of factional conflict

5    may either have the undesirable con-

6    sequence of negatively determining

7    Schaghticoke's tribal status. . .".

8    (5) Congress acknowledges that two noted Na-

9    tive American anthropologists retained to advocate

10    for the Schaghticoke Tribal Nation concluded after

11    exhaustive, years-long research that the group did

12    not and could not establish continuous community

13    and political authority as required by the acknowl-

14    edgment regulations, more particularly:

15    (A) Dr. William Starna, a professor of an-

16    thropology and expert in tribal acknowledgment

17    at the State University of New York at

18    Oneonta, who has worked on behalf of tribal pe-

19    titioners Gay Head Wampanoag, Golden Hill

20    Paugussett, and Eastern Pequot in addition to

21    the Schaghticoke Tribal Nation, concluded in

22    two separate reports, in 1989 and again in

23    1993, that the Schaghticoke Tribal Nation

24    could not satisfy either the continuous commu-

25    nity or political authority and influence criteria.

17

(B) Dr. Ann McMullen, a professor of anthropology and expert in tribal acknowledgment at Brown University, who has worked on behalf of tribal petitioners Mashpee and Paucatuck Eastern Pequot, conducted further research at the request of the Schaghticoke Tribal Nation. In a 1999, report Dr. McMullen affirmed Dr. Starna's s conclusions, saying that "too much still rests on Schaghticoke as a piece of Indian land occasionally occupied by Indians and not the focal point for a larger dispersed tribe".

(6)  Paragraph (4) demonstrates that the Schaghticoke Tribal Nation does not satisfy each of the seven mandatory criteria for acknowledgment under section 83.7 of title 25, Code of Federal Regulations. If further demonstrates willful manipulation of both the acknowledgment regulations and existing agency precedent by the Bureau of Indian Affairs.

(7) For the reasons described in paragraphs (4) and (6), the Final Determination acknowledging the Schaghticoke Tribal Nation as an Indian tribe within the meaning of Federal law is erroneous and unlawful.

18

1    (8) Congress cannot allow the erroneous and
2    unlawful decision of the Bureau of Indian Affairs to
3    acknowledge the Schaghticoke Tribal Nation as an
4    Indian tribe within the meaning of Federal law to
5    stand because of the significant, harmful, and irre-
6    versible effects it would have on neighboring commu-
7    nities, more particularly:

8        (A) A sovereign, federally acknowledged
9        Indian tribe is exempted from a broad range of
10       State laws and regulations, including State and
11       local taxation.

12       (B) A sovereign, federally acknowledged
13       Indian tribe is granted rights under Federal law
14       to engage in casino-style gaming under the In-
15       dian Gaming Regulatory Act, and the construc-
16       tion and operation of a Las Vegas-style casino
17       in Western Connecticut would place unbearable
18       burdens on municipalities, on local tax bases
19       and taxpayers, and on an aging transportation
20       infrastructure that could not tolerate the vol-
21       ume of traffic such a facility would create.

22       (C) A sovereign, federally acknowledged
23       Indian tribe has standing in Federal court to
24       pursue land claims litigation on property under
25       the Federal laws commonly known as the "Non-

19

1        Intercourse Act", claims that threaten land-

2        owners' property rights, cloud title in wide-

3        spread areas, and prevent the sale of real prop-

4        erty.

5    (b) PURPOSES.—The purposes of the Act are as fol-

6 lows:

7        (1) To repeal the Bureau of Indian Affairs' ac-

8        knowledgment of the Schaghticoke Tribal Nation as

9        an Indian tribe within the meaning of Federal law.

10        (2) To correct the unlawful and erroneous deci-

11        sion by the Bureau of Indian Affairs, in violation of

12        federal regulations and contrary to longstanding

13        agency precedent, to acknowledge the Schaghticoke

14        Tribal Nation as an Indian tribe within the meaning

15        of Federal law.

16        (3) To protect the taxpayers and municipalities

17        of the State of Connecticut from the undue burdens

18        and violations of sovereignty described in subsection

19        (a)(6).

20    (c) DEFINITIONS.—For the purposes of this Act, the

21 following definitions apply:—

22        (1) SCHAGHTICOKE TRIBAL NATION.—The term

23        "Schaghticoke    Tribal    Nation"    means    the

24        Schaghticoke Tribal Nation, a federally recognized

20

1     Indian tribe based at 33 Elizabeth Street, 4th Floor,

2     Derby, Connecticut, 06148.

3        (2) FINAL DETERMINATION.—The term "Final

4     Determination" means the decision document con-

5     taining an administrative decision made pursuant to

6     section 83 et seq. of title 25, Code of Federal Regu-

7     lations by the Office of Federal Acknowledgment,

8     Bureau of Indian Affairs, dated January 29, 2004,

9     affirmed by Aurene M. Martin, Principal Deputy As-

10    sistant Secretary-Indian Affairs, published in the

11    Federal Register on February 5, 2004 (69 Fed. Reg.

12    5570), that acknowledged the Schaghticoke Tribal

13    Nation as an Indian tribe within the meaning of

14    Federal law.

15       (3) REQUEST FOR RECONSIDERATION.—The

16    term "Request for Reconsideration" means the ad-

17    ministrative appeal of the Final Determination, initi-

18    ated by the Attorney General of the State of Con-

19    necticut on behalf of the State and Interested Par-

20    ties pursuant to section 83.11 of title 25, Code of

21    Federal Regulations, In re Federal Acknowledgment

22    of the Schaghticoke Tribal Nation, Docket Nos.

23    IBIA 04–83–A, IBIA 04–94–A, IBIA 04–95–A,

24    IBIA 04–96–A, and IBIA 04–97–A.

21

1    (d) REPEAL OF THE FEDERAL ACKNOWLEDGMENT

2  OF THE SCHAGHTICOKE TRIBAL NATION.—

3        (1) The Schaghticoke Tribal Nation is not an

4    Indian tribe within the meaning of Federal law and

5    does not maintain a government-to-government rela-

6    tionship with the United States.

7        (2) The Final Determination acknowledging the

8    Schaghticoke Tribal Nation as an Indian tribe with-

9    in the meaning of Federal law, maintaining a gov-

10    ernment-to-government relationship with the United

11    States, is repealed.

12        (3) The outcome of the Request for Reconsider-

13    ation shall have no effect on this Act.