**EXHIBIT 7**

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS

| | |
|---|---|
| IN RE FEDERAL ACKNOWLEDGMENT OF THE SCHAGHTICOKE TRIBAL NATION | Docket Nos.   IBIA 04-83-A<br>IBIA 04-94-A<br>IBIA 04-95-A<br>IBIA 04-96-A<br>IBIA 04-97-A |

**ANSWER BRIEF OF
SCHAGHTICOKE TRIBAL NATION
(PETITIONER #79)**

Eric Watt Wiechmann
McCarter & English
City Place I
185 Asylum Street
Hartford, CT 06103-3495
(860) 275-6700

Judith A. Shapiro
6856 Eastern Avenue, Suite 206
Washington, DC 20012
(202) 723-6400

Attorneys for the Schaghticoke Tribal Nation

Jerry C. Straus
F. Michael Willis
Hobbs, Straus, Dean & Walker, LLP
2120 L St., NW, Suite 700
Washington, DC 20037

Of Counsel

November 29, 2004

entitled to certain additional privileges connected with their reservation status. Such "new" facts do not contradict the Secretary's findings, nor represent research or issues not considered in the issuance of the FD. Rather, the breadth of evidence demonstrates a unique status in law by which Connecticut Indians living on reservations were exempt from taxation, provided housing based on tribal status and were not affirmed as citizens of the state until 1973.

The fifty "new" documents submitted in support of the State's request for reconsideration are neither new evidence nor persuasive, at any level, that the FD should be reconsidered. With no new evidence at all to contradict the AS-IA's findings, the State has not satisfied § 83.11(d)(1) by a preponderance of the evidence.

2) <u>The State Does Not Demonstrate that the Final Determination is Founded on Unreliable Evidence</u>.

The State's attack on "non-probative" or "unreliable" evidence aims at STN evidence of community and political authority as demonstrated through endogamous marriage patterns in the nineteenth century and by collective action petitioning the State during the same periods. For the reasons set forth below, those attacks miss their marks.

a) The STN Marriage Pattern Analysis Tracks OFA/BAR Regulations, Precedent and Prior Practice.

Because the Marriage Pattern analysis was new in the Final Determination, the State's objections to its use are new in its Request for Reconsideration. But those objections do not present new arguments, only the State's disagreement with the outcome,

and are without merit. Merely disagreeing with the BIA's analysis is not a basis for reconsideration. See Snoqualmie II, 34 IBIA at 33, 35; see also Cowlitz, 36 IBIA at 144.

The State's attack on the OFA's use of marriage patterns as evidence betrays the State's ignorance of the regulations, previous OFA/BAR practice, and of the social science principles underlying the validity of such evidence. 25 C.F.R. § 83.7(b)(1)(i) expressly provides that evidence of community "may be demonstrated . . . [by] [s]ignificant rates of marriage within the group." Section 83.7(b)(1)(ii) also expressly contemplates use of evidence of "[s]ignificant social relationships connecting individual members." Further, 25 C.F.R. § 83.7(c)(3) provides that, for any period in which a Petitioner (as part of 25 C.F.R. § 83.7(b)(2) demonstrates that at least 50 percent of the marriages in the group are within the group, it has satisfied criterion (c)(political authority) for that period as well.

Patently, any marriage among tribal members itself creates a social relationship connecting individual members, both between the parties to the marriage and among individuals from both families (in-laws, offspring and other relations) of the parties to the marriage.[14] The fact of significant rates of endogamous marriage within a tribe is itself proof of the previous relationship among tribal members – to the extent that such formalized relationships were contemplated, whether they represent political alliances or nothing more than personal affinity, a significant pattern of marriage within the community demonstrates that community drawing together against outsiders, and creating and maintaining significant ties for so long as the marriage partners are part of that community.

---

[14] See, GEORGE PETER MURDOCK, SOCIAL STRUCTURE 18, 62, 262, 265-66, 315 (endogamy); 60, 83,121, 297, 299 (group solidarity) (MacMillan Company 1949)(describing social ties created through endogamy); ELMAN R. SERVICE, PRIMITIVE SOCIAL ORGANIZATION 112-115 (Random House 1965)(same).

The OFA's reliance on heightened levels of endogamous marriage for the periods 1800 to 1820 and 1840 to 1880 is hardly new or unprecedented. Nearly every previous tribal acknowledgment decision has incorporated marriage pattern analysis as part of the description and analysis demonstrating a continuous functioning community, and sometimes as evidence of leadership. See, e.g., AS-IA, Summary of the Evidence for Proposed Finding of the Cowlitz Indian Tribe, at 23 (1997) (see also 62 Fed. Reg. 8983, 8984 (Feb. 27, 1997)); AS-IA, Summary under the Criteria and Evidence for Final Determination of the Poarch Band of Creeks, at 5 (1984) (see also 49 Fed. Reg. 24,083 (1984)); AS-IA, Summary under the Criteria and Evidence for Final Determination in Regard to Federal Acknowledgment of the Eastern Pequots of Connecticut at 16, 87, 94, 111 (2002); AS-IA, Summary of the Evidence for Proposed Finding of the Jena Band of Choctaw, at 7 (1994). The mechanics of the analysis need not be mysterious either, and are applied to the genealogical data already available from the elements of the Tribe's petition submitted in satisfaction of the requirements of 25 C.F.R. § 83.7(e) (genealogy).[15]

To further clarify the reliability of the use of endogamous marriage patterns, STN provides a separate report, entitled "STN Endogamy Analysis," (Exhibit C) clarifying the genealogical relationship of the subjects of the marriages central to the analysis, as well as a Declaration of Steven Austin, Ph.D., STN researcher, describing methodology [and purpose] of the endogamy marriage analysis. Exhibit C.

---

[15] Neither the Proposed Finding nor the Final Determination noted any significant errors in STN's presentation of its genealogy.

b) The STN Political Activities Provide Evidence of Political Authority.

The State asks the Board to Order Reconsideration of the STN FD based on the State's assertion that evidence of STN political authority was not probative. For example, the State urges that the OFA should have disregarded the 1892 Petition submitted on the Tribe's behalf by Truman Bradley (State Brief at 57-58); that it should similarly dismiss the decades of activity conducted on the Tribe's behalf by Swimming Eel, a non-member whose activities were conducted with the knowledge and involvement of members of all three tribal families (Id. at 68-74); that it should reject as irrelevant the rich history of intra-tribal conflict which is essentially the Tribe's political business of determining the power to allocate scarce resources – traditionally a key marker of political authority (Id. at 74-83).

The State's arguments, once again, wholly ignore the relevant regulations, case precedent, and the social science underlying the analysis of political authority. There is patently no basis to disregard the petitions and lawsuits filed on the Tribe's behalf, so long as those efforts continue a tribal practice (Bradley Petition) or are conducted with the knowledge and support of tribal members (Swimming Eel). Further, the regulations expressly identify internal conflict as evidence of political influence or authority. 25 C.F.R. § 83.7(c)(1)(v) describes:

> There are internal conflicts which show controversy over valued group goals, properties, policies, processes and/or decisions.

Manifestly, the STN community has had those conflicts over the years, and continues to have those conflicts to this day.[16] Previous cases have expressed concern that a tribal community without conflict is lacking an important marker of vital political life. See AS-IA, Summary under the Criteria for the Proposed Finding for the Chinook Indian Tribe/Chinook Nation, 24, 32-36 (1997); see also AS-IA, Summary under the Criteria and Evidence for Final Determination of the Snoqualmie Tribal Organization, at 43-44 (1997).

This approach, by regulation and by practice tracks the underlying social science view of political activity in tribal society. One such resource is the well-known and

---

[16] The State has expanded on its earlier assertions that internal conflict should defeat STN recognition. Because current splits within the tribal community have resulted in factions competing for leadership, along with resignations, re-alignments and feuds, one product of the Final Determination was the identification of a present day tribal community that includes, as a snapshot in time, a small number of individuals not on the STN roll, although fully qualified to be so. Thus, the FD recognizes a tribal community that exceeds its filed membership, should those politically alienated members choose to re-affiliate. At no time did the OFA violate its representation that it would not determine membership nor force anyone's membership. (See, Record of State Parties' April 8, 2003, TA meeting on STN Petition, State Exhibit 3.
    The acknowledgment regulations at 25 C.F.R. Part 83, obligate the Department to determine the continued existence of a tribal community, notwithstanding changes in name. 25 C.F.R. § 83.3(a) and 83.7(b)(1)(viii). Evidence of internal conflicts provide evidence of tribal existence, however, the Department cannot acknowledge "splinter groups" or "political factions." 25 C.F.R. §§ 83.7(c)(1)(v) and 83.3(d). As an artifact of the current internal political conflicts, a portion of the identified tribal community is not on the current membership list. Yet, the Department is still required to determine who constitute the members of the tribal community. 25 C.F.R. § 83.7(e)(2) (requiring petitioners to submit current membership lists as well as each former list of members). The Department is under no obligation to enroll, nor does it have authority to enroll, anyone who wishes to be included on or excluded from the membership roll. See, e.g. In re Federal Acknowledgment of the Snoqualmie Tribal Organization ("Snoqualmie I"), 31 IBIA 299, 301 (1997) (tribal enrollment dispute must be addressed pursuant to tribal procedures). The Department must nevertheless define the tribal community's membership by including those individuals eligible for membership and engaged as part of the political system of the tribal community. In the current context, the OFA identified the community to include the STN, as its roll was ultimately submitted, along with selected individuals that are currently part of another faction, or simply no longer enrolled with the main body, even though previously enrolled and even though close relatives remain with STN. The community determination, in turn becomes the Tribe's base roll, that will, going forward, delineate the maximum extent of community membership for all federal purposes. No one is ever forced to enroll, and any member can choose to leave.
    It is surely not unusual, as discussed below, for a tribal community to endure repeated factional conflict. The fact that the conflict has been heightened by the Recognition process itself does not in any way negate the BAR's conclusions on community.

respected Anthropologist Elman R. Service, who wrote one of the classic texts on non-western social organization:

> Thus a tribe is a fragile social body compared to a chiefdom or a state. It is composed of economically self-sufficient residential groups which because of the absence of higher authority take unto themselves the private right to protect themselves. Wrongs to individuals are punished by the corporate group, the "legal person." Disputes in tribal society tend to generate feuds between groups. The feud is the greatest source of disunity and disruption to any ungoverned society [by which Service means a society that has no formal structure], for feuds tend to perpetuate themselves, with each act of revenge typically generating a corresponding reprisal.
>
> Considering the lack of institutional political means of unity and the absence of organic solidarity, and considering such grave sources of disunity as feuds, it seems remarkable that a tribe remains a tribe.

ELMAN R. SERVICE, PRIMITIVE SOCIAL ORGANIZATIONS 114 (Random House 1965). Given this view, it would be surprising indeed were any tribe to survive without significant factional conflict, even without the extreme cultural and resource pressures endured by a tribe in the Northeastern United States.

Finally, and in response to the State's continued protestations that State recognition is unrelated to evidence of Tribal political authority, the STN provides an additional supplemental report, entitled "New Evidence of STN Political Authority, 1876-1936," attached hereto as Exhibit E.[17] Among other things, that supplemental research documents and analyzes how the Overseer assigned to STN by the State of Connecticut conducted his official business, <u>not</u> over a passive group of Indian descendants, but through consultation and joint efforts on behalf of the enrolled members of the STN. The evidence of that relationship shows that the State Overseer cooperated with key tribal members in preparing a court ordered census listing tribal members in

---

[17] In the event that the STN decision is forwarded to the Secretary or somehow remanded for reconsideration, STN respectfully requests that the STN reports and new evidence responding to the State's allegations be incorporated into the STN administrative record.

1902, that tribal leaders participated in decisions regarding the sale and protection of the Tribe's Reservation land and other resources (1870s to at least 1914), and tribal leaders affirmed the appointment of a new overseer by going to Court rather that submitting a written petition in 1905. Such direct evidence of political leadership during these years, especially combined with the interaction on the part of STN leaders with State officials presents a compelling case for tribal political authority throughout this period.

The State's attack on the probative value of STN evidence fails because it is defeated by express regulatory guidelines, by precedent, and by the theoretical underpinnings of the acknowledgment process. In responding to the State's factual attacks, the STN has conducted and provided the results of additional directed research to demonstrate the worthlessness of those attacks. The State has not met its burden under 25 C.F.R. § 83.11(d)(2) of showing, by a preponderance of the evidence, that the STN FD relied on non-probative or unreliable evidence.

### 3) The State Does Not Demonstrate that the OFA's Research (or the Tribe's) was Inadequate or Incomplete in Any Material Respect.

If anything, the State complains that the OFA conducted research into documentation readily available to it, despite the February 2000 directive purportedly relieving the agency of the responsibility to do so. State Brief at 169, note 60. In fact, the research comprising the data base supporting the Final Determination is the product of more than twenty years' data collection – principally conducted by the Tribe, but also supplemented by the substantial submissions of the many interested parties involved in the proceeding. As the State itself acknowledges, all of the parties have had the benefit of repeated technical assistance sessions with the agency staff. Along with STN, the