# EXHIBIT C

# Schaghticoke Tribal Nation's Response to the Connecticut Attorney General's "Endogamy Analysis"

Prepared by

Steven L. Austin, Ph.D.
Cultural Anthropologist

on behalf of the

Schaghticoke Tribal Nation

as Part of the Tribe's Answer Brief
in the IBIA Appeal of its Positive Final Determination

The Connecticut Attorney General (CTAG) has appealed the Department of the Interior's Final Determination to acknowledge the Schaghticoke Tribal Nation (STN, or "the Tribe") before the Interior Board of Indian Appeals on a variety of grounds, including allegations that the Acting Assistant Secretary – Indian Affairs (AS – IA) did not analyze data appropriately and/or accurately, and that the Acting AS – IA's analysis of the evidence and her conclusions were faulty, particularly in regard to the political authority criterion (25 CFR 83.7(c)), from 1820 to 1840 and from 1892 to 1936.

This paper addresses some of the allegations by the CTAG concerning the STN's rate of endogamy from 1820 to 1840. It does so by briefly reviewing the Acting AS – IA's analysis and conclusions in the Final Determination and by demonstrating the inadequacy and bias in the method suggested by the CTAG. A second paper by this author (attached to Answer Brief as Exhibit E) will describe and analyze new evidence that is being submitted and reviewed for the first time with this Answer Brief.

In the acknowledgment regulations, a 50 percent or higher endogamy rate is specifically mentioned as "sufficient evidence" (evidence that is convincing, in and of itself) that there is political authority within the Tribe (25 CFR 83.7(c)(3)). This provision in the regulations is based upon anthropological research which indicates that such a high rate of tribal endogamy results only when strong political, social, and cultural forces are operating. Such culturally-based behavior is based upon the tribal community's strong expectation or norm that it is proper and preferred that tribal members marry other tribal members. As such, endogamy is the result of the tribe

1

imposing its norms on the behavior of its community members, in this instance, controlling whom one can have sexual relations with, post-marital residence, and inheritance of property, among other things. Endogamy strengthens community in many ways. Village endogamy tends to keep all tribal members within their natal village, where they continue to interact with each other daily, on a face-to-face basis throughout their lives. The kinship ties created by endogamous marriages increase the economic and political interdependence of tribal community members, and promote the retention of economic resources within the Tribe. These social forces promote the cohesion among tribal members and the maintenance of tribal cultural traditions.[1]

Based on the Office of Federal Acknowledgment's (OFA) analysis of endogamy patterns, the STN Final Determination concluded that the Tribe met criterion 25 CFR 83.7(c)(3) from 1800 to 1820 and 1840 to 1870, having demonstrated an endogamy rate of 50 percent or more during those specific time spans. However, according to the OFA's analysis, the STN endogamy rate temporarily fell below 50 percent from 1820 to 1840 (40 percent from 1821 to 1830 and 45 percent from 1831 to 1840).[2] The STN's analysis of endogamy rates mirrored the results of the OFA for the last two decades of the

---

[1] Exogamy, by way of contrast, tends to result in one or the other marriage partner removing to the other marriage partner's village to live. Exogamy tends to create tensions in communities because of resentment over the expenditure of scarce family and community resources involved in raising children to a marriageable age, only to have them leave home to reside in their in-laws' village. Adding to this drain of economic resources, families in cultures which practice dowry suffer further economic loss when a daughter marries and moves to her husband's village, taking with her a significant amount of the family's wealth.

[2] The STN's analysis of endogamy rates for the Tribe (submitted as part of the Tribe's Comments on the Proposed Finding, September 30, 2003) concluded that the endogamy rate for STN members was above 50 percent for all of the decades from 1800 to 1880, but that the rate began to drop significantly in the 1880s until, in 1900, it fell well below 50 percent. It is very clear that the endogamy rate has not been above 50 percent since 1900. The difference in the OFA's and STN's endogamy calculations was not addressed in the Final Determination, the AS – IA simply substituting the OFA's analysis for STN's. For the sake of argument, the discussion in this paper assumes that the OFA's analysis is accurate, without concluding or agreeing that it is, in fact, so.

Nineteenth Century. The results of OFA's endogamy analysis are found in the Table below.

Table 1
Office of Federal Acknowledgment
Endogamy Analysis Results
(Source: STN Final Determination, p. 84)

| Decade | Endogamy Rate |
|---|---|
| 1801 to 1810 | 80 |
| 1811 to 1820 | 61 |
| 1821 to 1830 | 40 |
| 1831 to 1840 | 45 |
| 1841 to 1850 | 54 |
| 1851 to 1860 | 53 |
| 1861 to 1870 | 50 |
| 1871 to 1880 | 42 |
| 1881 to 1890 | 28 |
| 1891 to 1900 | 7 |

The CTAG presents two arguments opposing the results of the OFA's endogamy analysis in his STN IBIA Appeal Brief. First, he argues that the OFA did not apply the correct standards in its analysis of tribal endogamy. Of course, the manner in which CTAG would prefer to analyze endogamy patterns was carefully designed and executed to result in much lower endogamy rates throughout the 1800s. The extraordinarily biased approach adopted by the CTAG starts by denying the tribal membership of a rather large number of individuals whom the OFA has consistently concluded were tribal members. The CTAG also would institute a new method for calculating endogamy patterns, by counting marriages rather than marriage choices of individual tribal members. However, it has always been the practice of the OFA (formerly the Branch of Acknowledgment and Research, or BAR) to analyze the percentage of tribal members who chose to marry other tribal members, rather than the percentage of endogamous marriages. This is based upon

3

the anthropological understanding of endogamy as a tribally-sanctioned norm that controls (or seriously influences) the behavior of individual group members.

Second, the CTAG argues that, even if the conclusions in the Final Determination are correct, the AS – IA was wrong to assign weight to the continuous political relationship of the Tribe to the Colony and State of Connecticut, as evidence that the STN continued to exercise political authority over its members from 1820 to 1840, when the endogamy rate fell below 50 percent, according to the OFA's analysis. The CTAG suggests that the AS – IA was wrong to do so for at least two reasons.

First, the CTAG alternately denies and/or trivializes the significance of the well-established, continuous political relationship between the Colony/State of Connecticut and the STN. Since, in the CTAG's opinion, there was no political relationship between STN and the State, it follows that it was improper for the Acting AS – IA to attach any evidentiary weight to it. The CTAG begins a second argument by mischaracterizing the Acting AS – IA's conclusion regarding political authority from 1820 to 1840, stating that she used the State to Tribe political relationship to fill what is otherwise a complete gap in evidence regarding the Tribe's history from 1820 to 1840. Having set up the argument in this way, the CTAG goes on to argue that the Acting AS – IA improperly substituted the State to Tribe relationship to compensate for a complete lack of evidence for political authority from 1820 to 1840.

As noted in the Tribe's IBIA Answer Brief, these arguments by the CTAG in his IBIA Appeal Brief were already considered and dismissed by the AS – IA in the STN Final Determination. The grounds for rejecting the CTAG's multiple arguments as to why he believes the State to Tribe relationship was and is insignificant are clearly and

forcefully explained in the Final Determination (pp. 12-16). Some of the reasons for dismissing the CTAG's arguments are briefly outlined below.

In spite of the CTAG's opinion to the contrary, the Acting AS – IA concluded that there was evidence that the State to Tribe relationship was continuous, active, and substantive, from colonial times to the present. She concluded that this relationship was important because the State held reservation land in trust for the Tribe. She also concluded that, given the unique historical circumstances of Indian tribes in Connecticut, which were never offered a government-to-government relationship with the Federal government, the State to Tribe relationship serves as a significant parallel to the political relationship enjoyed by federally-recognized tribes.

The Acting AS - IA also concluded that there was enough evidence to demonstrate clearly that the Tribe's community was very strong, from 1800 to 1892, in spite of the minor fluctuation in the endogamy rate from 1820 to 1840. It is important to point out that even though the endogamy rate dropped to 40 percent from 1821 to 1830, it immediately started rising again from 1831 to 1840, to 47 percent. From 1841 to 1870, the endogamy rate was calculated by the OFA to have remained above 50 percent. The Final Determination also concluded that the residential patterns of tribal members, gauged by the percentage of tribal members who primarily resided on the Reservation was also supportive of a finding of continuous tribal political existence.

Therefore, rather than a complete gap in the evidence from 1820 to 1840 (as the CTAG would mischaracterize it), the evidence on the whole suggests that this temporary, minor dip in the endogamy rate during those two decades was an aberration, from which the Tribe quickly recovered. In fact, the evidence on record indicates that there were

many deaths among tribal members during the last decades of the Eighteenth Century and the early decades of the Nineteenth Century, which would account for this temporary anomaly. A large number of adult male tribal members made the ultimate sacrifice, dying while serving in the colonial military during the Revolutionary War. The Overseer's annual reports during the first half of the Nineteenth Century include references to the deaths of many tribal members, both those living on the Reservation and those living away. Also, there is evidence that during the first half of the Nineteenth Century, the Tribe incurred a serious debt in its account with the State appointed Overseer. This debt resulted from the medical bills of tribal members, and the burial costs associated with the deaths of tribal members. The Tribe's debt, thus incurred, was the main justification given by the Tribe's Overseer for illegally selling off about half of the Tribe's Reservation. An unusually high number of deaths due to epidemics such as small pox (which more severely impacts the elderly and the very young) would have at least two negative impacts on the endogamy rate: the deaths of elderly tribal members would bring existing endogamous marriages to an end, and infant and child mortality would reduce the number of potential tribal marriage partners for coming generations.

In conclusion, the CTAG's discussion and analysis of the endogamy evidence are not persuasive. The AS – IA has already evaluated this evidence and concluded that, from 1800 to 1880, the Tribe's endogamy rate is strongly indicative that the Tribe's social community was maintained throughout and that, for certain decades, 1800 to 1820 and from 1840 to 1870, the endogamy rate is so strong (50 percent or more), that the Tribe meets the provisions in the acknowledgment regulations for both community and political authority. The AS – IA's analysis of residential patterns also supports a positive

finding that political authority was exercised by the Tribe from 1800 to 1880. This finding is not surprising, given the tendency of endogamy to promote the continued residence of tribal members within their natal village. The CTAG's arguments and discussions, therefore, certainly are insignificant and do not constitute grounds for reconsideration, as discussed in the Tribe's IBIA Appeal Brief. The Acting AS – IA's Final Determination to acknowledge the STN should be affirmed by the IBIA.