**EXHIBIT 8**



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS
801 NORTH QUINCY STREET
SUITE 300
ARLINGTON, VA 22203

| | |
|---|---|
| IN RE FEDERAL ACKNOWLEDGMENT OF THE HISTORICAL EASTERN PEQUOT TRIBE : : : : : : : : : | Order Vacating and Remanding Final Determination<br><br>Docket Nos. IBIA 02-165-A<br>02-166-A<br>02-169-A<br><br>May 12, 2005 |

     The State of Connecticut (State); the Towns of Ledyard, North Stonington, and Preston, Connecticut (Towns); and the Wiquapaug Eastern Pequot Tribe (WEP) filed requests for reconsideration of the Final Determination (FD) by the Assistant Secretary - Indian Affairs (Assistant Secretary), to acknowledge the historical Eastern Pequot tribe as an Indian tribe within the meaning of Federal law. 1/ The Assistant Secretary issued the FD on June 24, 2002, and notice of the FD was published on July 1, 2002. 67 Fed. Reg. 44,234. The FD concluded that a single historical Eastern Pequot tribe, represented by and consisting of two petitioners, the Eastern Pequot Indians of Connecticut (EP) and the Paucatuck Eastern Pequot Indians of Connecticut (PEP), satisfied the regulatory criteria for Federal acknowledgment. For the

---

1/ The State's request was docketed as IBIA 02-165-A, the Towns' request was docketed as IBIA 02-169-A, and WEP's request was docketed as IBIA 02-166-A. WEP claims to be an Indian group descended from the historical Eastern Pequot Tribe, and is separately seeking Federal acknowledgment in proceedings before the Department's Office of Federal Acknowledgment.
     The Towns of Brookfield, Colchester, Cornwall, Danbury, Darien, Easton, Fairfield, Greenwich, Kent, Monroe, New Canaan, New Fairfield, New Milford, Norwalk, Orange, Roxbury, Shelton, Stamford, Stonington, Trumbull, Warren, Washington, Weston, Westport, Wilton and Woodstock, Connecticut, and the Housatonic Valley Council of Elected Officials, filed a brief as amicus curiae in support of the requests for reconsideration filed by the State and the three Towns. The Board treated amici's filing as a possible independent request for reconsideration, but following amici's clarification of their intent, the Board dismissed their submission as a separate request for reconsideration, without prejudice to their right to participate as amici in the remaining proceedings. In re Federal Acknowledgment of the Historical Eastern Pequot Tribe, 38 IBIA 144 (2002).

reasons discussed below, the Board of Indian Appeals (Board) vacates the FD and remands it to the Assistant Secretary for further work and reconsideration, and also describes for the Assistant Secretary additional alleged grounds for reconsideration that are not within the Board's jurisdiction.

## Regulatory Framework

The Department of the Interior's acknowledgment regulations provide the administrative process by which an American Indian group may demonstrate that it is entitled to be recognized as an Indian tribe, within the meaning of Federal law, and thus entitled to a government-to-government relationship with the United States. 59 Fed. Reg. 9280 col. 1 (Feb. 25, 1994); see 25 C.F.R. Part 83. Under those regulations, a group that petitions the Department to be acknowledged must satisfy seven criteria. 25 C.F.R. §§ 83.6(c), 83.7(a)–(g). The first three of those criteria are relevant to the issues over which the Board has jurisdiction in this case.

First, a petitioner must demonstrate that it "has been identified as an American Indian entity on a substantially continuous basis since 1900." 25 C.F.R. § 83.7(a) (criterion (a)). This criterion requires external identification of the petitioner as American Indian in character. See 59 Fed. Reg. at 9286 col. 2. The regulation lists several types of evidence of such external identification that may be relied upon to demonstrate criterion (a), including "[r]elationships with State governments based on identification of the group as Indian." 25 C.F.R. § 83.7(a)(2).

Second, the regulations require that "[a] predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present." 25 C.F.R. § 83.7(b) (criterion (b)). "Community" is defined as "any group of people which can demonstrate that consistent interactions and significant social relationships exist within its membership and that its members are differentiated from and identified as distinct from nonmembers. *Community* must be understood in the context of the history, geography, culture and social organization of the group." 25 C.F.R. § 83.1.

Criterion (b) lists several types of evidence deemed relevant to the definition of "community." Some examples include marriage rates and patterns, social relationships and interaction among members, shared economic activity among the membership, cultural patterns shared among members of the group, discrimination or other social distinctions by non-members, and the persistence of a named, collective Indian identity continuously over a period of more than 50 years, notwithstanding changes in name. See id. § 83.7(b)(1). Some combination of the listed types of evidence, or other evidence, may be used to demonstrate that a petitioner meets the definition of "community" in section 83.1.

41 IBIA 2

Third, 25 C.F.R. § 83.7(c) (criterion (c)) requires that "[t]he petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present." Id. § 83.7(c). "Political influence or authority" means

> a tribal council, leadership, internal process or other mechanism which the group has used as a means of influencing or controlling the behavior of its members in significant respects, and/or making decisions for the group which substantially affect its members, and/or representing the group in dealing with outsiders in matters of consequence. This process is to be understood in the context of the history, culture and social organization of the group.

25 C.F.R. § 83.1.

Criterion (c) lists various examples of evidence considered relevant to demonstrating political influence or authority, and provides that the criterion "may be demonstrated by some combination of the [listed] evidence * * * and/or by other evidence" that the petitioner meets the definition of "political influence or authority" in section 83.1. Some examples of the listed evidence include the group's ability to mobilize significant numbers of members and resources from its members for group purposes, the importance to the membership of issues acted upon by group leaders, and widespread knowledge, communication, and involvement in political processes by most of the group's members. Id. § 83.7(c)(1)(i)–(iii). Demonstrating that the group meets the "community" criterion at more than a minimal level is also deemed relevant to showing the existence of political influence or authority. Id. § 83.7(c)(1)(iv).

An "essential requirement" of criterion (c), as previously interpreted by the Assistant Secretary, "is that group leaders influence the opinions or actions of a substantial number of group members on issues regarded as significant to the group as a whole and [that] the actions of leaders are influenced by the group." Mar. 7, 1994, Summary Under the Criteria and Evidence for Final Determination for Federal Acknowledgment of the Mohegan Tribe of Indians of the State of Connecticut, at 27. Described another way, "[i]t must be shown that there is a political connection between the membership and leaders and thus that the members of a tribe maintain a bilateral political relationship with the tribe. This connection must exist broadly among the membership." June 9, 1992, Summary Under the Criteria and Evidence for Final Determination Against Federal Acknowledgment of the Miami Nation of Indians of the State of Indiana, Inc., at 15; see also Official Guidelines to the Federal Acknowledgment Regulations, 25 CFR 83, at 49 (Sept. 1997) (Critical Documents (CD) Ex. 73) (formal structure not required, but there must be leaders and followers); Sept. 12, 1994, Letter from Morris (BIA) to Cunea (PEP) (CD Ex. 48) (same); Mar. 13, 1990, Letter from Eden (BIA) to Sebastian (EP) (CD Ex. 47) (evidence should be provided to show how political processes and authority were maintained within the group).

41 IBIA 3

A petitioner must demonstrate the existence of community and political influence or authority "on a substantially continuous basis, but this demonstration does not require meeting these criteria at every point in time." 25 C.F.R. § 83.6(e). "Fluctuations in tribal activity during various years shall not in themselves be a cause for denial of acknowledgment under these criteria." Id.

A criterion is met if the evidence establishes "a reasonable likelihood of the validity of the facts relating to that criterion." 25 C.F.R. § 83.6(d). Conclusive proof is not required. Id. The regulations describe specific forms of suitable evidence that may be used to demonstrate the requirements, but "[t]he criteria may be met alternatively by any suitable evidence that demonstrates that the petitioner meets the requirements of the criterion statement and related definitions." 25 C.F.R. § 83.6(g).

## Factual Background

The Proposed Findings (PF) for EP and PEP and the FD extensively recite the history of the Eastern Pequot, which need not be repeated here. To briefly summarize, however, the designation of a group of Pequot Indians as the "Eastern Pequot" apparently can be traced back to the second half of the 17th century, from the pattern of dispersal of Pequot prisoners among the Mohegan, Narragansett, and Eastern Niantic, after the so-called "Pequot War of 1637." See Summary under the Criteria and Evidence for Proposed Finding - Eastern Pequot Indians of Connecticut (SCE PF EP) at 13 (Mar. 24, 2000). According to the EP PF, a group of Pequots, which became the antecedent to both the EP and PEP petitioners, came to settle in an area within the present-day boundaries of the State of Connecticut. Sometime in the mid- to late- 17th century, the Colony of Connecticut assumed responsibility for the care of what became referred to as the Eastern Pequot, appointing governors and overseers for them, and setting aside land for them, which became known as the Lantern Hill Reservation, located near North Stonington, Connecticut. From that time to the present, the Colony, and later State, of Connecticut maintained oversight responsibilities for the Lantern Hill Reservation and had a distinct relationship with the Eastern Pequot who resided or were entitled to reside on the reservation lands.

On June 28, 1978, EP submitted to BIA a letter of intent to petition for Federal acknowledgment. On June 20, 1989, PEP submitted a letter of intent to petition for Federal acknowledgment. Both EP and PEP asserted descent and tribal continuity from a historical Eastern Pequot tribe. The two primary antecedent family lines for PEP are the Gardner and Jackson families. The primary antecedent family line for EP is the Sebastian family.

On January 1, 1998, the Assistant Secretary placed the EP petition on active consideration, and on April 2, 1998, the Assistant Secretary decided to consider the EP and PEP petitions simultaneously.

On March 31, 2000, the Assistant Secretary published notices of two PFs, one for each petitioner. 65 Fed. Reg. 17,294 (PEP); 65 Fed. Reg. 17,299 (EP). Each PF proposed to determine that the respective petitioner exists as an Indian tribe. Each was based on a determination that the "historical Eastern Pequot tribe" satisfied criteria (b) and (c) from historical times to 1973, and that each petitioner satisfied the remaining five criteria in section 83.7.

The Assistant Secretary declined to make proposed findings for EP and PEP for criteria (b) and (c) for the post-1973 period, stating that there was insufficient information to determine whether a single tribe existed, composed of both petitioners (as factions of that tribe), or whether one or both petitioners should be separately acknowledged as a tribe(s). 65 Fed. Reg. at 17,299 cols. 2-3, 17,302 col. 3, 17,304 cols. 1-2. The Assistant Secretary also noted the possibility that neither petitioner might receive a favorable final determination, after consideration of the evidence and analysis received during the comment period. Id. at 17,304 col. 2.

In proposing to find that the historical Eastern Pequot tribe satisfied the criteria for community and political authority through 1973, the Assistant Secretary characterized the relationship between the State of Connecticut and the Eastern Pequot as "state recognition" of the historical Eastern Pequot tribe, and described that relationship as an "important consideration" in the proposed findings to acknowledge Petitioners. SCE PF EP at 135. As further described by the Assistant Secretary:

> The evaluation of these petitions pertains to Indian groups which have had both continuous recognition by the State of Connecticut and continuous existence of a state reservation since the colonial period. These unique factors provide a defined thread of continuity through periods when other forms of documentation are sparse or do not pertain directly to a specific criterion. State recognition under these circumstances is more than the identification of an [Indian] entity, because it reflects the existence of a tribe. The general body of evidence has been interpreted in the context of the tribe's relationship to the colony and the state.
> * * * * Members of the tribe occupied a somewhat different status than non-Indians within Connecticut. This evidence provides a common backbone and consistent backdrop for interpreting the evidence of continued tribal existence. When weighed in combination with this historical and continuous existence, evidence on community and political influence carries greater tha[n] would be the case under circumstances where there was no evidence of a longstanding relationship with the state based on being a distinct community.

65 Fed. Reg. at 17,300 col. 1.

On June 24, 2002, after receiving comments on the proposed findings, the Assistant Secretary issued the FD, concluding that the historical Eastern Pequot tribe, consisting of both EP and PEP, constituted a single tribe, which satisfied the seven regulatory criteria for Federal acknowledgment in 25 C.F.R. § 83.7. See 67 Fed. Reg. 44,234. 2/ In reaching that conclusion, the FD considered and rejected arguments raised by the State and Towns that the State's relationship with the Eastern Pequot was based purely on the Indian descent of individuals and not on any State view that the group constituted a politically-functioning Indian tribe. The FD also rejected PEP's arguments that it was not and had never been part of the same tribe as EP, and that the acknowledgment regulations do not permit the Assistant Secretary to "combine" two petitioners into a single recognized tribe. 67 Fed. Reg. at 44,235 col. 2. 3/

In concluding that the historical Eastern Pequot tribe satisfied criterion (b) from the colonial period through 1973, the FD relied upon a variety of evidence, including reservation residency, marriage rates within the group, and various patterns of social association. See, e.g., SCE FD EP at 135; see 67 Fed. Reg. at 44,236 cols. 1-2. For the period from 1940 to 1973, the FD found that there was a strong demonstration of social cohesion among the families antecedent to EP; that the main antecedent family to PEP, the Gardners, was sufficiently small and closely related to assume social cohesion within that family; and that the Jackson family functioned as a "bridge" or "connector" between the otherwise then separate EP and PEP antecedent family lines. 67 Fed. Reg. at 44,237 col. 1.

---

2/ In addition to the Federal Register notice, the Assistant Secretary signed determinations for each petitioner: Summary Under the Criteria and Evidence for Final Determination in Regard to Federal Acknowledgment of the Eastern Pequot Indians of Connecticut as a Portion of the Historical Eastern Pequot Tribe (SCE FD EP) (June 24, 2002), and Summary Under the Criteria and Evidence for Final Determination in Regard to Federal Acknowledgment of the Paucatuck Eastern Pequot Indians of Connecticut as a Portion of the Historical Eastern Pequot Tribe (SCE FD PEP) (June 24, 2002). These two documents share certain identical sections addressing common issues, such as the Assistant Secretary's consideration of the State relationship and the reservation. For convenience, the Board will refer and cite to the SCE FD EP, rather than to both documents. Pagination in all citations is based on hard copies of documents in the administrative record, rather than on electronic copies.

3/ Since the 1970's, when the two petitioning groups were organized, there has been conflict between the two over the issues of descent from and continuity with the historical Eastern Pequot tribe, and over the use of the Lantern Hill reservation. The conflict itself pre-dated the 1970's, and arose, at least in part, based on the contention by members of PEP that the members of EP were not, in fact, of Indian descent.

41 IBIA 6

For the post-1973 period, the FD concluded that the geographic pattern of residence among the EP members was "sufficiently close to be supporting evidence of more direct evidence of social connections," SCE FD EP at 19, although it found EP's reports that were intended to demonstrate modern community problematic, see id. at 136. For PEP, the FD found that the present geographic pattern of residence made significant social interaction feasible, but was insufficient to provide supporting evidence of community. 67 Fed. Reg. at 44,237 col. 2. Instead, the FD relied on interview evidence and an analysis provided by PEP concerning a "core social group" to find that PEP satisfied the "community" criteria. For the tribe as a whole during this period, the FD found that the evidence reflected increasing social polarization between EP and PEP, but that "political processes of the entire Eastern Pequot" bridged the two groups and showed the existence of a single community, because the "crucial focus" of both petitioners was to control and maintain access rights to the single reservation, which the State had established for a single group. Id.

In finding that criterion (b) was satisfied, the FD did not specifically identify for any particular time period or periods to what extent the State's relationship with the Eastern Pequot was considered as relevant evidence, or what weight was being given to such evidence. The FD did state, however, that the State's relationship with the Eastern Pequot provided "an additional form of evidence," which was weighed with other evidence, and which "exists throughout the time span, but is most important during specific periods where the other evidence in the record concerning community and political influence would be insufficient by itself." SCE FD EP at 78. As such, the FD indicates that absent the evidence of the State's relationship with the Eastern Pequot, the evidence for criterion (b) was insufficient for at least one or more unspecified time periods.

With respect to criterion (c) — political influence or authority — for the period between 1873 and 1920, the FD found that political influence had been shown in part by a series of petitions presented to the State Superior Court from 1873 through 1883, signed by individuals from families antecedent to both EP and PEP, as members of the Pequot tribe of Indians of North Stonington. In addition, the FD found that new evidence demonstrated that Calvin Williams functioned as a leader during at least part of this time period, dealing with the state-appointed overseer and consulting with the membership on decisions. 67 Fed. Reg. at 44,237 col. 3; SCE FD EP at 145.

For the period between 1913 and 1940, the FD found that the "strong character of the community, especially based on intermarriage ties, provides strong supporting evidence for the existence of significant political processes." 67 Fed. Reg. at 44,237 col. 3. The FD further stated:

> For the time period between 1913 and 1940, particularly from 1913 to 1929, between the death of Calvin Williams and the appearance of Atwood I.

41 IBIA 7

> Williams, Sr., [in 1933] as an influential leader, the continuous State relationship with the Eastern Pequot as an Indian tribe provides additional evidence which, in combination with the limited direct evidence, demonstrates continuity of political processes throughout periods in which there is not sufficient positive evidence by itself, but in which positive evidence exists.

67 Fed. Reg. at 44,238 col. 1; see SCE FD EP at 22.

The FD found that Atwood I. Williams, Sr. was "the state-recognized leader for all of the Eastern Pequots from 1933 until his death in 1955," and that there was limited evidence that he was elected by a portion of the membership and that the State took notice of this election. 67 Fed. Reg. at 44,237 col. 3 – 44,238 col. 1. "Even though Williams took a stance against the membership of the Brushell/Sebastian portion of the Eastern Pequots, he was recognized by and dealt with the State as leader of the entire group." Id. at 44,238 col. 1. The FD also noted, however, that "State implementation of [Williams'] status was inconsistent and varied," but "existed throughout the time span from 1933 to 1955." Id.

Aside from the evidence regarding Atwood I. Williams, Sr., for the period between 1940 and 1973, the FD noted sporadic additional evidence to support the existence of political processes, although it found that there was insufficient evidence to demonstrate that any particular individuals served as either formal or informal leaders. The FD reiterated, however, its finding that social community existed throughout this period. As it did for the analysis of criterion (c) for the period between 1913 and 1940, the FD also considered the State's relationship with the Eastern Pequot in concluding that criterion (c) was satisfied for the period from 1940 to 1973:

> The continuous state relationship with the Eastern Pequot as an Indian tribe and continuing existence of the Lantern Hill reservation with tribal members resident on it under state supervision is additional evidence which, in combination with the other evidence, demonstrates continuity of political processes throughout the period, from 1940 to 1973, in which there is not otherwise sufficient positive evidence, but in which positive evidence does exist.

67 Fed. Reg. at 44,238 col. 3.

For the 1970's, the FD concluded that the "bridge" formed by the Jackson family between the Sebastians of EP and the Gardners of PEP demonstrated that there was a "single political field" within which the conflict between the Sebastians and Gardners played out, rather than a conflict between two completely separate groups. According to the FD, the Jacksons did not align themselves with PEP until 1989, indicating that "alignments among the Eastern Pequot subgroups were still being adjusted in 1989." Id.

For the post-1973 period, the FD found that the events that led to the formation of the EP and PEP were a contest for power over access to the reservation, the legitimacy of the Sebastians as Eastern Pequots, and competition to obtain designation as the Eastern Pequot tribe's sole representative. 67 Fed. Reg. at 44,239 col. 1. According to the FD, each petitioner demonstrated substantial political processes within its own membership, involving common issues dating from at least the 1920's, when there was "strong evidence" for the existence of a single community. Id. Each petitioner, according to the FD, controlled the allocation of reservation resources — a type of evidence supporting political influence and authority — although the allocation was "not sufficient evidence of political processes in itself under [25 C.F.R.] § 83.7(c)(2)(i), because the processes are parallel rather than a single process, but is strong evidence of political processes." Id. at 44,239 col. 2. In the context of these common issues and conflict over the same resource and status, the FD concluded that the evidence demonstrated that only a single tribe existed, "notwithstanding the present organization of those [political] processes into two distinct segments." Id. at 44,239 col. 3. Finally, in finding that criterion (c) was satisfied for the period from 1973 to the present and that both petitioners constituted a single tribe, the FD stated:

> The continuous historical State recognition and relationship are based on the existence of a single Eastern Pequot tribe, resident on a single land base which the tribe has occupied since colonial times and continues to occupy jointly. These facts provide added evidence that the petitioners meet the regulations as a single political body, notwithstanding current divisions and organization.

67 Fed. Reg. at 44,239 col. 3; SCE FD EP at 27.

The FD addressed at some length its use and consideration of the relationship between the State and the Eastern Pequot in determining that criteria (b) and (c) were satisfied, describing the character, underpinnings, and evidentiary value of the relationship as follows:

> This final determination concludes that the State relationship with the Eastern Pequot tribe, by which the State since colonial times has continuously recognized a distinct tribe with a separate land base provided by and maintained by the State, and which manifested itself in the distinct, non-citizen status of the tribe's members until 1973, provides an additional form of evidence to be weighed. This evidence exists throughout the time span, but is most important during specific periods where the other evidence in the record concerning community or political influence would be insufficient by itself. The continuous State relationship, although its nature varied from time to time, provides additional support in part because of its continuity throughout the entire history of the Eastern Pequot tribe.