> There is implicit in this state-tribal relationship a recognition of a distinct political body, in part because the relationship originates with and derives from the Colony's relationship with a distinct political body at the time the relationship was first established. Colony and State laws and policies directly reflected this political relationship until the early 1800's. The distinct political underpinning of the laws is less explicit from the early 1800's until the 1970's, but the Eastern Pequot remained non-citizens of the State until 1973. The State after the early 1800's continued the main elements of the earlier relationship (legislation that determined oversight, established and protected land holdings, and exempted tribal lands from taxation) essentially without change or substantial questioning throughout this time period.

SCE FD EP at 14 (emphases added).

> This relationship defined the Eastern Pequot tribe as a group with a distinct status not shared by any non-Indian group in the State, and was based on their status as a group rather than being a racial classification of individuals. By contrast, Connecticut treated individual, non-tribal, Indians the same as the remainder of the population.

Id. at 29.

The FD continues:

> There are significant periods at the beginning and the end of the historical span which partake of a Colony or State relationship with a distinct political community. Through most of the intervening period from the American Revolution to 1973, the relationship was less explicitly based on the status of the tribes as distinct political communities. However, the tribes continued to be based on a distinct status not shared by non-Indians, and not a welfare relationship as argued by the third parties.

Id. at 30.

The FD identified the "major elements" of the "continuous" relationship between the State and the historical Eastern Pequot tribe as: (1) a separate reservation land base set aside by the State since 1683 for the Eastern Pequot, which was not subject to taxation or adverse possession; the land and the funds derived from it were defined as belonging to the tribe, although title was held by the State; (2) State-appointed overseers, since 1764, with authority over the tribe's reservation land and funds, and responsible for the welfare of the tribe's members; (3) the non–State-citizenship status of members of the tribe until 1973, under which

they were not legally eligible to vote in State and local elections, which was a distinction that applied to members of the specific tribes recognized by the Colony and State and not to other Indians living within the State; and (4) Colony and State laws which, until 1808, "clearly reflect the idea that the tribes had a distinct political status," a status which continued after 1808 in the form of the first three elements. SCE FD EP at 29-30.

With respect to the citizenship status of Eastern Pequot Indians, the FD discussed several pieces of evidence to support its conclusion that the Eastern Pequot did not have state citizenship prior to enactment of a 1973 state statute. 4/ First, at a 1939 hearing concerning the Lantern Hill Reservation, a state official presented a statement asserting that "[t]hese Indians are not citizens of the town; * * * they are state wards." SCE FD EP at 62. Second, in 1941, a state official described Grace (Jackson) Gardner Boss, an Eastern Pequot, as not being a voter, while simultaneously describing her husband — apparently not Eastern Pequot — as a voter. Id. Third, the FD noted a 1953 state bill, which was introduced but not passed, "[t]o end the second class citizenship of Connecticut's few remaining Indians," and which referred to "the Eastern Pequot tribe and the several members thereof residing in the town of North Stonington, or in any other town in this state." Id.

The FD also noted contrary evidence, including a 1956 state official's statement that tribal members on reservations in Connecticut "have all the rights of American citizens," and a 1961 statement by a state legislative committee chairman that "Indians in Connecticut have full citizenship privileges." SCE FD EP at 63. To reconcile this conflicting evidence, the FD concluded that "[w]hile practices may have changed, the evidence submitted showed no legal change in the citizenship status of Connecticut's tribal Indians," until the State enacted special legislation in 1973. Id. The 1973 Act provided: "It is hereby declared the policy of the state of Connecticut to recognize that all resident Indians of qualified Connecticut tribes are considered to be full citizens of the state and they are hereby granted all the rights and privileges afforded by law, that all of Connecticut's citizens enjoy." See SCE FD EP at 63 (quoting Conn. Gen. Stat. § 47-59a).

Although the FD expressly considered the State's relationship with the Eastern Pequot as significant, it also concluded that the relationship is "not evidence sufficient in itself to meet the criteria," and is "not a substitute for direct evidence at a given point in time or over a period of time." SCE FD EP at 14. Rather, the FD treated the State's relationship as "additional

---

4/ No question has been raised whether the Eastern Pequot were considered citizens of the United States long before 1973. According to the FD, what was unclear was whether a 1924 Federal statute granting United States citizenship to Indians living in tribal relations was considered by Connecticut to automatically bestow State citizenship on Connecticut's tribal Indians. The State and Towns dispute the premise that the Eastern Pequot were living in tribal relations in 1924.

evidence which, when added to the existing evidence, demonstrates that the criteria are met at specific periods in time." Id.

### Requests for Reconsideration

For the most part, the State and Towns allege the same or similar grounds for reconsideration of the FD. As discussed below, the Board has jurisdiction over some of those allegations, but not others.

The primary objection raised by the State and Towns to the FD is to its use of the State's relationship with and purported "recognition" of the Eastern Pequot as a political entity as evidence to find that Petitioners satisfied the "community" and "political influence or authority" criteria in the regulations. The State and Towns contend that "state recognition" can never be used as evidence for criterion (b) or (c). They also contend that various evidence relied upon to characterize the relationship as "state recognition" was unreliable or of little probative value, that BIA's or the petitioners' research was inadequate or incomplete, or that "new evidence" refutes certain evidence on which the FD relied. Among other things, the State and Towns challenge the FD's conclusion that Eastern Pequots were not citizens of the State and not eligible to vote in state or local elections until 1973. The State and Towns also raise several other challenges to evidence possibly relied upon in the FD to conclude that criteria (b) and (c) were satisfied, and that EP and PEP were two factions within a single tribe, rather than separate groups that are not part of a single community and political framework.

The Eastern Pequot Tribal Nation (EPTN) 5/ responds by contending that the Assistant Secretary fully analyzed and considered all of the arguments raised by the State and Towns, and that they have nothing new to say here. EPTN contends that (1) the State's relationship with the Eastern Pequot was and is based on tribal political status; (2) the State and Towns grossly exaggerate the weight that the FD places on the issue of the Eastern Pequot's citizenship status and voting rights; (3) the State and Towns have not demonstrated that the FD relied upon non-probative evidence, and the "new evidence" they proffer is not truly new, and could not affect the determination because it is of a type already considered by the FD; and (4) the FD's application of the state relationship was "determinative with other existing evidence for only two small periods of time totaling approximately 34 years, out of over 300 years of continuous tribal existence," EPTN Answer Br. at 68. EPTN also suggests that the FD could have reached a favorable determination without relying on the state relationship.

---

5/ Since issuance of the FD, the membership of EP and PEP have organized as EPTN, and appear as such before the Board. See EPTN Answer Br. at 1 n.1.

41 IBIA 12

WEP's primary contention is that the Assistant Secretary should have considered including WEP in the single Eastern Pequot tribe that the FD acknowledged. As explained below, the Board concludes that all of WEP's alleged grounds for reconsideration, though sometimes cast in the language of the Board's jurisdiction, are in substance outside the scope of the Board's jurisdiction.

Board Jurisdiction, Scope and Standard of Review

The Board's jurisdiction to review a final determination of the Assistant Secretary - Indian Affairs on a petition for Federal acknowledgment is limited to reviewing four grounds for reconsideration:

(1) That there is new evidence that could affect the determination; or

(2) That a substantial portion of the evidence relied upon in the Assistant Secretary's determination was unreliable or was of little probative value; [6/] or

(3) That petitioner's or the [Bureau of Indian Affairs'] research appears inadequate or incomplete in some material respect; or

(4) That there are reasonable alternative interpretations, not previously considered, of the evidence used for the final determination, that would substantially affect the determination that the petitioner meets or does not meet one or more of the criteria in § 83.7(a) through (g).

25 C.F.R. § 83.11(d)(1)–(4).

The party requesting reconsideration bears the burden to establish, by a preponderance of the evidence, that one or more of the grounds for reconsideration over which the Board has jurisdiction exist. 25 C.F.R. § 83.11(e)(9), (10).

If a request for reconsideration alleges additional grounds for reconsideration that do not fall within the Board's jurisdiction, the Board is required to describe those grounds and

---

6/ The regulations do not define the terms "unreliable" or "of little probative value," nor has the Board done so is prior acknowledgment decisions. Black's Law Dictionary (6th ed. 1990), however, defines "reliable" as "[t]rustworthy, worthy of confidence." It defines "probative evidence" as "tending to prove, or actually proving an issue; that which furnishes, establishes, or contributes toward proof[;] * * * having fitness to induce conviction of truth, consisting of fact and reason co-operating as co-ordinate factors." (Citations omitted.)

refer them to the Secretary, if the Board affirms the final determination, or to the Assistant Secretary - Indian Affairs, if the Board vacates and remands it for further work and reconsideration. See 25 C.F.R. § 83.11(e)(10), (f)(1), (f)(2).

## Discussion

### State and Towns' Alleged Grounds for Reconsideration

1.  Use of "State Recognition" Generally as Evidence for Criterion (b) or (c).

The State and Towns contend that the FD must be reconsidered because the acknowledgment regulations categorically preclude the use of a state relationship with a petitioning group, even state recognition of the group as a political entity, as relevant evidence for satisfying criterion (b) or (c).

As an initial matter, we must decide whether we have jurisdiction to consider what is in effect a legal argument that the regulations and precedent never permit a state's relationship to be used as evidence of criterion (b) or (c). Subsection (d)(2) of 25 C.F.R. § 83.11 allows the Board to consider allegations that the Assistant Secretary improperly relied upon evidence that is unreliable or of little probative value. If the regulations or precedent preclude the use of a state's relationship with a petitioning group as relevant evidence for criteria (b) and (c), then by definition such evidence cannot be considered or relied upon as having any "probative" value for those criteria. Therefore, we conclude that the scope of the Board's jurisdiction under 25 C.F.R. § 83.7(d)(2) is broad enough for us to consider the State and Towns' arguments that the regulations simply do not permit the State's relationship to be considered as reliable or probative evidence for criterion (b) or (c).

The State argues that by including state relationships as suitable evidence under criterion (a) — external identification of a group as American Indian — but not under criteria (b) and (c), principles of statutory construction require us to interpret the regulations as intended to exclude such evidence from consideration for criteria (b) and (c). We disagree. As the State concedes, the regulations expressly provide that the examples of suitable evidence listed for each criterion are not exclusive. See 25 C.F.R. § 83.6(g). While we agree that principles of statutory construction might support a conclusion that a type of evidence listed for criterion (a), but not for criterion (b) or (c), cannot be considered as *necessarily* or even presumptively suitable evidence for criterion (b) or (c), we do not agree that those principles of construction mandate a conclusion that BIA intended that such evidence could *never* be accepted as suitable for criterion (b) or (c).

The State and Towns seek to distinguish the types of evidence listed as suitable for criteria (b) and (c), which the Towns describe as "first-hand" and "specific," as opposed to

"secondary or tertiary characterizations" based on "outside assessments and relationships," which the Towns contend are relevant "only" to criterion (a). Towns' Request for Recon. at 7. We are not prepared to interpret the regulations in such a categorical and limited manner, based on such broad generalizations. Instead, we believe that a more logical and natural interpretation of the regulations, and one which considers their overall purpose and intent, is that a state's relationship with a petitioner may be used for demonstrating (b) and (c) if that evidence is in fact reliable and probative of one or more specific elements of the definitions of "community" or "political influence or authority" in 25 C.F.R. § 83.1. In other words, the definitions themselves should control whether evidence may be considered probative. The listed examples of suitable evidence for the various criteria may identify types of evidence that BIA deemed to be *intrinsically* suitable for demonstrating the respective criteria. We are not convinced, however, that the regulations were intended to categorically exclude evidence from consideration under criterion (b) or (c), simply because it was deemed intrinsically suitable for demonstrating criterion (a), but not deemed intrinsically suitable for demonstrating (b) or (c).

The State quotes BIA's 1997 Guidelines, which say that "gaining state recognition has no effect on the Federal recognition process," but that a long-standing relationship between a state and a petitioner can be used to satisfy criterion (a). See State Request for Recon. at 32. The State then asserts that this language is "unequivocal" in declaring "that state recognition has no bearing on Federal recognition." Id. But the State omits the word "gaining" from its paraphrase. The word "gaining" suggests that BIA intended to address the practical effect of recently-obtained state recognition. And BIA's comment on using a long-standing relationship for showing criterion (a) does no more than restate what is explicitly provided for in the regulations. But this guidance, addressing as it does two issues at opposite ends of a spectrum, does not, in our view, carry with it any necessary implication for the distinct, and more complicated, issue in the present case — whether a state relationship or state recognition may ever be used as probative evidence for criterion (b) or (c).

Previous acknowledgment decisions, such as the favorable determination for the Mohegan Indian Tribe and the negative determination for the Golden Hill Paugussett Tribe, which the State cites as further support for its position, do little more than take the same approach as the guidelines in stating the obvious — that state recognition has been deemed intrinsically suitable as evidence for demonstrating criteria (a), but is not dispositive for the ultimate determination whether a group is entitled to Federal recognition. None of the language relied upon by the State from prior Departmental acknowledgment decisions addresses the precise issue raised in this case.

The State and Towns also contend that a state's relationship with an Indian group is simply not relevant to criteria (b) and (c) because both criteria pertain to internal group processes, and a state relationship with a group does not reveal the types of activities and relationships within the group that are necessary for demonstrating those criteria. That

41 IBIA 15

argument, in our view, oversimplifies the components of criteria (b) and (c), and overgeneralizes the potential character of state relationships with petitioners. As a practical matter, we are not persuaded that the relationship between a state and a petitioner, which could be varied and complex, can *never* be probative evidence for demonstrating the existence of community or political influence and authority within the petitioner. Rather, as discussed in more detail below, the evidentiary relevance and probative value of such a relationship depends on the specific nature of the relationship, the specific underlying interaction between a state and a petitioner, and how that relationship and interaction reflect in some way one or more of the elements in the definitions of "community" or "political influence or authority" contained in section 83.1. As such, we disagree with the State and Towns' contention that a state relationship can *never* be used for criterion (b) or (c) because it is *inherently* nonprobative or *necessarily* different in type from the types of evidence allowed for (b) and (c).

We conclude that neither the acknowledgment regulations, nor BIA's interpretation of those regulations through guidelines and other acknowledgment decisions, categorically precludes evidence of the relationship between a state and a petitioner from being considered for criteria (b) and (c). Instead, whether such evidence is relevant, reliable, or probative, and the proper weight to be afforded it, must be determined on a case- and fact-specific basis.

2.   Use of "Implicit" State Recognition of the Eastern Pequot in the FD.

Although we reject the State and Towns' argument that evidence regarding a state relationship with a petitioner must be categorically excluded from consideration for criteria (b) and (c), we agree with them that there is nothing *intrinsic* in such evidence that makes it relevant or probative for criteria (b) and (c). EPTN does not appear to disagree with this point, nor does the FD suggest otherwise. The point of disagreement is whether the State's relationship with the Eastern Pequot in this case, as used and relied upon in the FD, constitutes evidence that is either unreliable or of little probative value for demonstrating criteria (b) and (c).

The FD concluded that four particular elements of the State's relationship with the Eastern Pequot — explicit laws prior to the 1800's and again after 1973, a reservation, state overseers, and noncitizenship status — and the continuity of the latter three elements over time, made the State's relationship probative of (b) and (c) because it constituted "implicit" recognition between the early 1800's and 1973 that the Eastern Pequot existed as a tribal political entity. The FD reached this conclusion even while noting that the "nature" of the relationship itself varied from time to time. See SCE FD EP at 14. Alternatively, the FD characterized the "political underpinnings" of this relationship as "less explicit" during that 170-year time span, but emphasized that the three legal and administrative elements of the relationship remained. Id.

The FD then used the State's continuous relationship and implicit recognition of the Eastern Pequot as a political entity, as "additional evidence" that tipped the scales for demonstrating criteria (b) and (c) when the other evidence for a particular time period was insufficient. With respect to criterion (b), it is not clear to what extent the FD actually relied on state recognition, but the FD does suggest that it made the difference at least for one or more time periods. See SCE FD EP at 78 (state relationship "exists throughout the time span, but is most important during specific periods where the other evidence in the record concerning community and political influence would be insufficient by itself"). And for criterion (c), for at least portions of the 60-year period between 1913 and 1973, the FD specifically invoked state recognition to overcome otherwise insufficient evidence. See id. at 22; 67 Fed. Reg. at 44,238 cols. 1, 3. In addition, the State's continuous relationship was given some indeterminate weight for the post-1973 period to support the FD's finding that the two petitioners in fact constituted two factions of a single tribe. See SCE FD EP at 26-27; 67 Fed. Reg. at 44,239 cols. 2-3.

The State and Towns, of course, dispute the notion that there was any state recognition — implicit or otherwise — of the Eastern Pequot as a political entity, at least until relatively recently. 7/ Assuming, however, for the sake of argument, that there is reliable and probative evidence to support the FD's finding that the distinct elements of the relationship existed on a continuous basis, through which the State did implicitly recognize the Eastern Pequot as a political entity between the 1800's and 1973, the issue is whether such implicit state recognition constitutes evidence that is reliable or of more than little probative value for criterion (b) or (c).

To satisfy criterion (b), a petitioner must "demonstrate that consistent interactions and significant social relationships exist within its membership and that its members are differentiated from and identified as distinct from nonmembers." 25 C.F.R. § 83.1 (defining "community"). We agree with EPTN that the State's relationship with the Eastern Pequot may be probative of the second part of the definition — whether its members were differentiated

---

7/ In 1979, the Governor of Connecticut formally certified, for revenue sharing purposes, that certain groups within the State described as Indian tribes, including the Paucatuck Eastern Pequot, had recognized governing bodies which exercised substantial governmental functions, including making membership determinations and making reservation land assignments. See Nov. 8, 1979, Letter from Grasso to Williams (EPTN Answer Br. Exh. 23); see also Apr. 9, 1996, Letter from Stetson to Deer (CD Exh. 77 at 104a) (discussing same certification for Golden Hill Tribe of the Paugussett Nation). In 1989, the State enacted legislation "recogniz[ing] that the indigenous tribes, the Schaghticoke, the Paucatuck Eastern Pequot, the Mashantucket Pequot, the Mohegan and the Golden Hill Paugusett are self-governing entities possessing powers and duties over tribal members and reservations." Conn. Gen. Stat. § 47-59a(b) & note.

from and identified as distinct from nonmembers. But we fail to see how the State's "implicit" recognition of the Eastern Pequot as a political entity, without more, would be probative for showing "that consistent interactions and significant social relationships exist within its membership," id. And even if the State had laws and administrative mechanisms that were structured to treat the Eastern Pequot as a single group, that fact alone would not seem to be probative for showing whether the Eastern Pequot actually existed as a single community. The FD does not suggest that the Eastern Pequot were coerced by elements of the State relationship to be a single community. In order for the State's relationship to be probative of the first part of the definition of "community," it would need to be more than "implicit," and would need to be expressed in some way that reflected the actual or likely existence of those interactions and social relationships. But the FD treats the significance of state recognition in this case on far too general a level for us to be convinced that it is evidence that can be considered reliable or probative for the entire definition of community, and the FD makes no distinction between the components of that definition in considering the state relationship as probative.

We have the same difficulty with the FD's use of state recognition for criterion (c). Criterion (c) requires a petitioner to demonstrate that it has maintained political influence or authority over its members. 25 C.F.R. § 83.7(c). As interpreted by the Assistant Secretary, this requires a showing that the members maintain a bilateral relationship with the tribe, and that the connection exists broadly among the membership. June 9, 1992, Summary Under the Criteria and Evidence for Final Determination Against Federal Acknowledgment of the Miami Nation of Indians of the State of Indiana, Inc., at 15. As with criterion (b), this criterion requires at least some evidence of interaction within the group — leaders influencing followers and followers influencing leaders. Once again, we fail to see how "implicit" state recognition of a group as a political entity constitutes probative evidence that the group actually exercises political influence or authority, and that there are actually leaders and followers in a political relationship. Rather, there needs to be more than "implicit" recognition, and the relationship between the State and the group needs to be expressed in some way that reflects the existence or likely existence — not simply theoretical or presumed — of political influence or authority within the group, as defined by section 83.1.

For example, the FD states that from 1933 through 1955, the State (through a court decree) recognized Atwood Williams, Sr. as the leader of the entire Eastern Pequot tribe, that there is evidence that he was elected, and that the State took notice of that election. See supra, 41 IBIA at 8. To the extent that the evidence shows that the State's actions were in response to or reflective of political processes within the group, we think it would be probative, at least for the time period for which the State's actions can be shown to reflect those processes. The FD notes, however, that the State's "implementation" of Atwood Williams' status was "inconsistent and varied," that the State had to be "reminded" of that status, and that from 1941 through 1947, there was no documentation of activities by Williams. SCE FD EP at 23; 67 Fed. Reg. at 44,238 col. 1. As such, it is not clear that a state-court-decreed recognition in 1933 of

Williams as the elected leader of the group could be probative for more than a portion of the 1933 through 1955 time period to demonstrate one or more elements of the definition of political influence or authority found in 83.1. 8/ We do not suggest that evidence of Williams' leadership or interaction with the membership must be shown at every point in time between 1933 and 1955. The regulations do not require that. See 25 C.F.R. § 83.6(e). Our difficulty is that the FD appears to assume that the State court decree in 1933 has probative value for showing political processes within the group for the entire subsequent 22-year period, and that the State's recognition of Williams as leader of the entire Eastern Pequot tribe is probative for showing that a bilateral relationship existed between the leadership and members of the group as a whole, including the Sebastians. 9/

In addition, the probative value of particular evidence cannot be determined in a vacuum. Rather, it must be determined in context, and in relation to other evidence. The FD appears to use the 1933 state court decree as evidence of Williams' leadership and political processes within the group for the entire period between 1933 and 1955. Yet it also notes that in 1939, the State Attorney General issued an opinion asserting that "Indian tribal organizations" no longer existed within the State. SCE FD EP at 70. In 1955, the State Attorney General issued a similar opinion, stating that Connecticut Indians had "wholly lost their political organization and their political existence." See State's Request for Recon. Ex. 18. 10/ In that context, we fail to see how "implicit" state recognition of the group as a tribe, or even explicit recognition of Williams as a leader in 1933, can be treated as reliable and probative evidence for demonstrating the definition of political influence and authority for the group as a whole for the entire 22-year time period. The issue, of course, is not whether the 1939 and 1955 Attorney General opinions are themselves probative that the Eastern Pequot tribe no longer existed — they may not be. Rather, the issue is on what basis the State's admittedly "inconsistent and varied" relationship with Williams can be viewed as reliable and probative evidence of criterion (c) for the entire period, or whatever period(s) of time is sufficient to meet the "substantially continuous basis" requirement in section 83.6(e).

---

8/ Probative evidence of political influence or authority is not limited to direct evidence of internal interaction within a group, as the State and Towns seem to suggest. It includes, for example, evidence that shows that leaders are "making decisions for the group which substantially affect its members," or are "representing the group in dealing with outsiders in matters of consequence." 25 C.F.R. § 83.1.

9/ The PF and FD found that Atwood Williams, Sr., who descended from PEP antecedent families, opposed reservation residency by descendants of Tamar (Brushell) Sebastian (the primary EP family line). SCE PF EP 113, 115; SCE FD EP at 150-51.

10/ As the State points out, the FD did not mention the 1955 Attorney General opinion.