For the 1955 - 1973 period, the FD found that there was insufficient evidence to demonstrate that any particular individuals served as either formal or informal leaders of the group as a whole, and it cites no evidence that the State dealt with particular individuals as leaders of the entire group. 67 Fed. Reg. at 44,238 col. 2. It does discuss several examples of individuals asserting leadership in discrete or limited contexts, and concludes that "the whole complex of individual leaders' activities * * * provides some evidence to demonstrate political influence." Id. at 44,238 col. 2-3. It then invokes the "continuous state relationship," in combination with the other evidence, as demonstrating continuity of political processes for this time period, "in which there is not otherwise sufficient positive evidence, but in which positive evidence does exist." Id. at 44,238 col. 3. In this context, we fail to see how implicit state recognition or the "continuous state relationship," used in such a non-specific way, can be considered reliable or probative evidence for demonstrating criterion (c), when no particular component of the definition of "political influence or authority" is discussed, and the 1955 Attorney General opinion is not addressed.

Nor do we think that the underlying elements of the State's relationship with the Eastern Pequot, even as understood and characterized in the FD, may be relied upon in such a general way as probative evidence of criterion (b) or (c). For example, the existence of an Eastern Pequot reservation may have been conducive to community and political processes within the group, but the FD itself acknowledges that it could not be used as direct evidence that such community or political processes actually existed. And its probative value as indirect evidence would seem to depend upon a more specific showing that the State's action in maintaining the reservation reflected one or more components of the definitions of community or political influence or authority for the group.

Similarly, assuming that Eastern Pequots legally remained noncitizens of the State until 1973, and even assuming that their noncitizen status was tied to a continued status under State law as "tribal" Indians, it is far from clear — particularly in the context of evidence suggesting uncertainty among State officials concerning their citizenship status — that their legal status under state law in any way actually reflected or was tied to a continuation of the actual internal group activities or processes that would directly demonstrate the requirements of criterion (b) or (c). For example, although the FD refers to "members" of the Eastern Pequot as disenfranchised until 1973, it does not indicate how they were determined to be "members," or whether the criteria for "membership" remained the same throughout the relevant time periods. The PF found that from 1941 to 1973, there was "no evidence in the record that the State of Connecticut was looking at 'membership' in the Eastern Pequot tribe in any meaningful sense. * * * Connecticut paid no attention to anyone who didn't apply for reservation residency, and evaluated that simply on the basis of being able to show descent and 1/8 blood (very vaguely defined and certainly not scientifically computed)." SCE PF EP at 89. Although the FD — unlike the PF and apparently based on additional evidence — identified the non-State-citizenship status of Eastern Pequots as a key element of the relationship between them and the

41 IBIA 20

State, it does not explain how that status is specifically probative for demonstrating the definitions of "community" and "political influence or authority." Was it in some way reflective of differentiating members from nonmembers (a component of the definition of community), or of current dynamics within the group, or was it simply a historical hold-over? 11/

The FD goes to great length to explain how the Eastern Pequot may have had a distinct status under state law — a status not shared by Indians generally or by non-Indians — but fails to articulate how that status is probative of actual interaction, social relationships, or a bilateral relationship between the group and its members. Instead, the FD uses state recognition as nonspecific catch-all "additional evidence" to tip the scales for finding that criteria (b) and (c) are satisfied.

We have considered the voluminous discussion in the FD concerning the state relationship with the EP, the elements of that relationship, and the underlying specific evidence relied upon to characterize those elements and that relationship. We have also considered the extent to which the FD does, or does not, articulate how that relationship is used for demonstrating particular elements within the definitions of "community" and "political influence or authority." We are left with the firm conviction that "implicit" state recognition of the Eastern Pequot as a political entity, and the underlying elements of the relationship, at least as used and explained by the FD, are of little or no probative value as evidence to demonstrate that the group actually met the definitions of "community" and "political influence or authority." In order for the State's relationship with the EP to be shown to be reliable and probative evidence of community and political processes, the FD must articulate more specifically how the State's actions toward the group during the relevant time period(s) reflected or indicated the likelihood of community and political influence or authority within a single group. And it may be that the State's interaction may be probative for some purposes, but not others. But we conclude that, as used in the FD, the State's relationship was unreliable and of little probative value as evidence for criteria (b) and (c).

That conclusion, by itself, is not sufficient to order reconsideration. Under 25 C.F.R. § 83.11(d)(2), in addition to establishing that evidence relied upon was either unreliable or of little probative value, a party requesting reconsideration must establish that it constituted a "substantial portion" of the evidence relied upon. The Board has applied the "substantial portion" test by looking at the practical effect of the unreliable or non-probative evidence. For

---

11/ For example, in comments on the PFs, PEP contended that "eligibility for [state 'welfare' benefits to Eastern Pequot individuals] was contingent upon the existence of a bilateral political relationship between the individual and the Tribe." Sept. 4, 2001, Eberhardt & Karns, at 11 (CD Ex. 14). The FD does not make that finding, but if supported by the evidence in the record, that aspect of the State's relationship would seem to have probative value for criterion (c).

example, evidence that is unreliable or of little probative value does not constitute a "substantial portion" where reversing the affected portion of the final determination would not change the ultimate determination. In re Federal Acknowledgment of the Ramapough Mountain Indians, Inc., 31 IBIA 61, 80 (1997); cf. The American Heritage Dictionary (1976) (definition of "substantial" includes "material" and "considerable in importance"). Conversely, if the affected portion of a final determination, if reversed, would or likely could change the ultimate determination, then the evidence that is unreliable or of little probative value may constitute a "substantial portion" of the evidence relied upon.

EPTN contends that state recognition was only determinative for a couple of small periods of time, totaling 34 years, 12/ or that it may not have really been determinative at all. EPTN contends that the State and Towns overstate the degree to which the FD relied upon state recognition. In effect, EPTN suggests that whether the state recognition evidence is unreliable or of little probative value does not matter here, because it did not constitute a "substantial portion" of the evidence relied upon in the FD, as required to meet the burden of proof for reconsideration under 25 C.F.R. § 83.11(d)(2).

We disagree. The FD quite clearly acknowledges that state recognition is "most important" for those time periods when the other evidence would be insufficient. It is not the Board's role to re-analyze or re-weigh the evidence, or to determine whether the time periods in which there is insufficient evidence, without reliance on state recognition, are sufficiently short that criteria (b) and (c) could still be demonstrated on a "substantially continuous basis." See 25 C.F.R. § 83.6(e). Whether or not the FD *could* have reached the same conclusion without relying on state recognition, it chose to rely on it to tip the scales in favor of Petitioners. As described in the FD, state recognition was a material and important part of certain portions of the finding that the historical Eastern Pequot tribe satisfied criteria (b) and (c). If those affected portions were reversed, it likely could affect the ultimate determination. Therefore, we conclude that the FD's use of the State's relationship constituted a "substantial portion" of the evidence relied upon in the FD.

We conclude, with respect to the FD's use of implicit state recognition and the State relationship with the Eastern Pequot, that the State and Towns have satisfied their burden of proof to show that a substantial portion of the evidence relied upon in the Assistant Secretary's

---

12/ EPTN's figure is based on its contention that the FD only used the State's relationship as additional evidence between 1913-1929 and 1955-1973. EPTN Answer Br. at 5, 68. The FD itself invokes the State's relationship for the periods between 1913-1940 and 1940-1973, and also for the post-1973 period, although it does appear to have relied on it more heavily for some periods than for others. See 67 Fed. Reg. at 44,238 cols. 1, 3. Even accepting EPTN's characterization, we would vacate and remand because of the significance that the FD attached to state recognition in reaching a favorable determination.

determination was unreliable or of little probative value. Therefore, we must vacate and remand the Final Determination to the Assistant Secretary for further work and reconsideration, pursuant to 25 C.F.R. § 83.11(d)(2) and (e)(10).

3. <u>Noncitizenship Status of the Eastern Pequot</u>

As indicated earlier, in addition to their general attack on the FD's use of state recognition, the State and Towns also contend that in this case, the State's relationship with the Eastern Pequot was never actually one of recognizing the group as a political entity — implicitly or otherwise — and that the FD's conclusion to the contrary is based on evidence that is unreliable or of little probative value, refuted by reliable evidence in the record, and refuted by new evidence. In particular, the State contends that one of the key elements on which the FD relied for characterizing the nature of the State's relationship with the Eastern Pequot was the conclusion that, until 1973, they were not citizens of the State and not eligible to vote. The State argues that the evidence relied upon by the FD to reach this conclusion was unreliable and of little probative value, and contradicted by new evidence showing numerous Eastern Pequot individuals on voter registration lists.

As we noted earlier, the probative value of particular evidence cannot be determined in a vacuum, but must be considered in context. In light of our discussion and conclusion above concerning the use of the State's relationship — including the elements of that relationship — as evidence for criteria (b) and (c), we believe it is unnecessary for the Board to address this argument. On reconsideration, if the Assistant Secretary decides that it is still necessary or appropriate to treat the citizenship status of Eastern Pequots as probative of either criteria (b) or (c), he will necessarily have to re-examine and re-analyze the evidence concerning their citizenship status in order to determine precisely how that status is probative at a given time. In addition, upon reconsideration and as part of that re-examination of the evidence, the Assistant Secretary should consider the new evidence offered by the State, which appears to show that certain Eastern Pequot individuals were included on state voter registration rolls.

4. <u>Evidence of Community in the 20th Century</u>

The State contends that the evidence, without reliance on state recognition, is insufficient to support a finding that one or both petitioners, or a single Eastern Pequot tribe as a whole, satisfied the "community" criterion for much of the 20th century. In addition, however, the State argues that the remaining "limited" evidence that the FD relied upon for finding that this criterion was satisfied is not probative. In particular, the State contends that "Fourth Sunday meetings" and "High Street meetings" involving Eastern Pequots are not probative evidence of community. The State also argues that the FD's conclusion that the Jackson family served as a "bridge" between the otherwise estranged Sebastian and Gardner

families is based on unreliable interview summaries. See State's Request for Recon. at 37-40, 45-47.

Whether or not the evidence as a whole — in the absence of reliance on implicit state recognition — would be sufficient to find that criterion (b) is satisfied, is an issue that is not within the Board's jurisdiction. In any event, it is something that the Assistant Secretary will have to examine on reconsideration in light of our conclusion about state recognition.

With respect to the reliability and probative value of the evidence, however, we conclude that the State has not carried its burden to prove that the evidence it challenges is either unreliable or of little probative value for showing interaction or social connections between Eastern Pequots from the various family lines, relevant to criterion (b). In addition, although interview summaries may be a less desirable form of evidence than interview transcripts, we are not prepared to rule that interview summaries are necessarily unreliable or of little probative value. As EPTN points out, the FD specifically took into account the State and Towns' concerns about the use of interview evidence and summaries. EPTN Answer Br. at 74-75. We agree with EPTN that the State and Towns are essentially asking the Board to second-guess the weight that the FD gave to this evidence, which we cannot do. See In re Federal Acknowledgment of the Snoqualmie Tribal Organization, 34 IBIA 22, 35 (1999). We recognize that there is not always a clear line between weight of evidence and reliability or probative value, and on reconsideration, it may be appropriate for the Assistant Secretary to address the State's arguments that too much weight was afforded to too little evidence. We conclude, however, that the State has not demonstrated, by a preponderance of the evidence, that the evidence of meetings and social activities involving Eastern Pequots, and the interview summaries, are unreliable or of little probative value.

5.   Evidence of a Single Political Entity in the Post-1973 Period

The State similarly contends that the evidence, without reliance on state recognition, is insufficient to support a finding that criterion (c) was satisfied during the 20th century. As already stated, the Board does not review the sufficiency of otherwise probative and reliable evidence. Particularly for the pre-1973 period, the FD's evaluation of the evidence of political influence and authority within the group as a whole appears to have been closely connected with reliance on state recognition. Therefore, we leave it to the Assistant Secretary, on reconsideration, to reevaluate the evidence as a whole for the pre-1973 period.

With respect to the post-1973 period, the State contends that in order to find that EP and PEP were part of a single political entity, the FD "manufactured" a unifying, overarching political process based on a theory of "parallel" but separate political processes within each petitioner. See State's Request for Recon. at 51-55. The State argues that the FD itself found that "[t]here was little data to show any present community connection between the members

of the two groups or to demonstrate that the dispute takes place within a framework in which there are relationships between the members and/or leaders of the two memberships." State's Request for Recon. at 53 (quoting SCE FD EP at 177) (State's emphasis omitted). The State argues that despite this finding, the FD found that because each group could demonstrate its own political processes, and because both groups were competing for the same goals — control of the reservation and recognition as the sole representative of the Eastern Pequot — the "parallel political processes" in this context were evidence of a single overall political entity. According to the State, that reliance on "parallel" processes, communities, or political authorities is not what the regulations require. State's Request for Recon. at 53.

These allegations challenge the FD's analysis and interpretation of the evidence, in finding that EP and PEP constituted factions of a single political entity, rather than two separate entities, during the post-1973 period. Allegations that the Assistant Secretary erred in analyzing or interpreting the evidence are not within the scope of the Board's jurisdiction. In re Federal Acknowledgment of the Cowlitz Indian Tribe, 36 IBIA 140, 145, 150-51 (2001). Therefore, we refer the State's allegations to the Assistant Secretary, as follows: Should the FD be reconsidered on the ground that the FD improperly disregarded a lack of evidence of connections between EP and PEP, or of a single political framework, and improperly relied on "parallel political processes" within EP and PEP, and competition for the same resource and status, as evidence that EP and PEP were factions within a single political entity.

6.   The Two 1873 Documents

The Towns contend that the FD gave improper weight to a June 26, 1873, Eastern Pequot petition and a June 27, 1873, list of Eastern Pequot members, to tie the Petitioners' ancestors to the historical Pequot Tribe, and in particular Tamar Brushell, an ancestor of EP members. The Towns argue that the "origins and validity" of the petition are "very questionable." Towns' Request for Recon. at 52  In addition, the Towns contend that the list of tribal members is "of questionable reliability." Id. at 56.

While casting its allegations in the jurisdictional language of the Board, in substance the Towns appear to be challenging the authenticity of these documents. The Board does not have jurisdiction to review the authenticity of documents, nor would it have the expertise to do so. Similarly, with respect to the Towns' assertion that the FD gave "improper weight" to these documents, we have already noted that this issue is not within the Board's jurisdiction.

We refer these allegations to the Assistant Secretary as follows: Should the FD be reconsidered on the ground that the authenticity of the 1873 petition and list has not been satisfactorily demonstrated, or on the ground that the FD gave improper weight to those documents?

7.      Reservation Residency Evidence

The Towns also contend that the FD placed "improper and incorrect weight" on the purported residency of Petitioners' ancestors on the Lantern Hill Reservation. The Towns argue that incomplete or inadequate research resulted in a "critical" incorrect determination in the FD that a majority of Petitioners' ancestors resided on the reservation in the pre-1873 time period. Towns' Request for Recon. at 57.

We find that the Towns have not satisfied their burden of proof to demonstrate that the petitioners' or BIA's research was incomplete or inadequate in some material respect. The Towns offer their own analysis of census data from 1850 through 1920, but do not contend that it is "new evidence" or that the census data was not part of the record considered by the Assistant Secretary.

In effect, the Towns contend that the Assistant Secretary made a critical error in how he analyzed the available evidence, which is different from showing that the research itself was inadequate or incomplete.

These allegations challenge the FD's analysis or interpretation of the evidence, and are not within the Board's jurisdiction. See Cowlitz Indian Tribe, 36 IBIA at 145, 150-51. Therefore, to the extent that the Towns contend that the FD is based on an erroneous analysis of the evidence, we refer this allegation to the Assistant Secretary: Should the FD be reconsidered on the ground that it placed improper or incorrect weight on evidence regarding the residency of Petitioners' ancestors on the Lantern Hill Reservation?

8.      Recognition of a Single Tribe Based on Two Acknowledgment Petitions

The State contends that recognition of a single tribe, based on two separate acknowledgment petitions, is not permitted under the regulations. State's Request for Recon. at 57-59. This issue is not within the scope of the Board's jurisdiction, and therefore we refer it to the Assistant Secretary: Should the FD be reconsidered on the ground that recognition of a single tribe, based on two separate acknowledgment petitions, is not permitted under the regulations?

9.      Tribal Membership Rolls

The State contends that the tribal membership rolls don't reflect the requisite tribal relations, and that the Assistant Secretary failed to account for a recent "massive enrollment drive," which added individuals with little or no prior contacts with Petitioners. State Request for Recon. at 48. The composition of a petitioner's membership is not an issue that is within the Board's jurisdiction to review. See In re Federal Acknowledgment of the Snoqualmie

Tribal Organization, 31 IBIA 299, 301 (1997); In re Federal Acknowledgment of the Snoqualmie Tribal Organization, 31 IBIA 260, 261-62 (1997). Therefore, we refer this allegation to the Assistant Secretary: Should the FD be reconsidered on the ground that the tribal membership rolls do not reflect the requisite tribal relations?

10. <u>Proposed Findings for the Post-1973 Period</u>

The State alleges that the proposed findings unlawfully failed to include proposed findings for the post-1973 period, thereby denying interested parties proper notice and a meaningful opportunity to comment. State's Request for Recon. at 59-63. This issue is not within the scope of the Board's jurisdiction, and therefore we refer it to the Assistant Secretary: Should the FD be reconsidered on the ground that the proposed findings denied interested parties of proper notice and meaningful opportunity to comment with respect to the post-1973 period?

11. <u>Other Alleged Procedural Irregularities</u>

The State contends that the FD is a product of a process "marked by irregularities." State's Request for Recon. at 64. The State argues that former Assistant Secretary Gover's role in the proceedings was "highly questionable," id. at 67, including his issuance of a February 11, 2000, memo — without notice or opportunity for public comment — that prohibited BIA from conducting independent research in acknowledgment proceedings. This issue is not within the scope of the Board's jurisdiction, and therefore we refer it to the Assistant Secretary: Should the FD be reconsidered on the ground that the proceedings were marked by irregularities, including the Assistant Secretary's issuance of the February 11, 2000, memo concerning BIA research in acknowledgment proceedings?

12. <u>Congressional Delegation of Authority</u>

The State and Towns contend that there is no proper delegation of authority from Congress to BIA to recognize a group as an Indian tribe. State's Request for Recon. at 69-71; Towns' Request for Recon. at 4. This issue is not within the scope of the Board's jurisdiction, and therefore we refer it to the Assistant Secretary: Should the FD be reconsidered on the ground that BIA does not have authority to recognize a currently non-federally-recognized group as an Indian tribe?

<u>WEP's Alleged Grounds for Reconsideration</u>

WEP's fundamental objection to the FD is that the Assistant Secretary did not consider whether WEP, as a group also claiming descent from the historical Eastern Pequot tribe, should

have been combined with Petitioners EP and PEP as constituting the present-day continuation of the historical Eastern Pequot tribe. WEP contends that the FD should be reconsidered because: (1) the Assistant Secretary should have issued a revised Proposed Finding before "combining" the two petitioners, in order to afford WEP notice and an opportunity to comment; (2) the Assistant Secretary failed to clearly establish the conditions under which other "factions" of the historical Eastern Pequot Tribe might be afforded entry into the recognized group, and therefore violated due process and equal protection of law to WEP as a similarly situated, recognizable group; (3) the Assistant Secretary committed procedural error by not considering WEP's submissions as formal comments on the proposed finding, and therefore those submissions should be considered as "new, relevant and material evidence," and a ground for reconsideration under 83.11(d)(1); (4) the Assistant Secretary exceeded his legal authority "in recognizing non-Indians as Indians," to the prejudice of WEP's "aboriginal" rights to the reservation lands; and (5) the Assistant Secretary failed to provide relevant information from the record requested by WEP under the Freedom of Information Act (FOIA).

Although WEP attempts to bring at least some of these allegations within the Board's jurisdiction by arguing that its submissions constitute "new evidence" that the Board may review under 25 C.F.R. § 83.11(d)(1), in substance all of WEP's allegations are outside of the Board's jurisdiction. Clearly, WEP's procedural challenges are outside of our jurisdiction. And even if WEP's submissions should be considered as "new evidence," WEP's only argument about how it "could affect" the determination is that it could change the composition of the tribal membership. As EPTN correctly notes, and as we have already held, membership issues are outside the Board's jurisdiction. EPTN Answer Br. at 88-89.

We therefore refer WEP's allegations, as described above but with the exception of WEP's FOIA contention, 13/ to the Assistant Secretary.

---

13/ The Board recognizes that allegations falling outside of its jurisdiction may or may not state grounds that actually would warrant *reconsideration* of the FD, as distinct from simply repeating arguments that were fully considered in the FD or provide no real basis for reconsideration. The regulations, however, require that the Board "describe" for the Assistant Secretary alleged grounds for reconsideration that fall outside the Board's jurisdiction. 25 C.F.R. § 83.11(f)(1). Given the absence of any explicit role — or standard — for the Board to screen such allegations, the Board's general practice is to refer such allegations to the Secretary or Assistant Secretary, who have jurisdiction to decide whether further consideration is appropriate. In limited circumstances, however, the Board has declined to refer allegations to the Secretary or Assistant Secretary. See, e.g., Snoqualmie Tribal Organization, 31 IBIA 299; Snoqualmie Tribal Organization, 31 IBIA 260. In the case of WEP's FOIA allegation, because FOIA appeals are clearly governed by 43 C.F.R. § 2.18, and not 25 C.F.R. Part 83, we decline to refer this issue to the Assistant Secretary.

Conclusion

For the reasons discussed above, and pursuant to the authority delegated to the Board of Indian Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1 and 25 C.F.R. § 83.11, the Board vacates and remands the Final Determination to the Assistant Secretary for further work and reconsideration, pursuant to 25 C.F.R. § 83.11(e)(10). Pursuant to 25 C.F.R. § 83.11(f)(1), the Board has also described alleged grounds for reconsideration that are outside of the Board's jurisdiction, which are referred to the Assistant Secretary for consideration, as appropriate.

I concur:

// signed //
Steven K. Linscheid
Chief Administrative Judge

// signed //
Anita Vogt
Senior Administrative Judge

In re Federal Acknowledgment of the
Historical Eastern Pequot Tribe
Docket Nos. IBIA 02-165-A, 02-166-A,
and 02-169-A
Order Vacating and Remanding Final
Determination
Issued May 12, 2005
41 IBIA 1

Distribution:

Mark F. Kohler, Esq.
Daniel R. Schaefer, Esq.
Office of the Attorney General
State of Connecticut
P.O. Box 120
Hartford, CT  06141-0120
    BY FEDERAL EXPRESS

Guy R. Martin, Esq., et al.
  for Towns of Ledyard, Preston
  & North Stonington, Connecticut
Perkins Coie, LLP
607 - 14th Street, NW
Washington, DC  20005-2011
    BY FEDERAL EXPRESS

Bruce N. Goodsell, Esq.
  for Wiquapaug Eastern Pequot Tribe
16 High Street, Suite G
Westerly, RI  02891
    BY FEDERAL EXPRESS

Ira W. Bloom, Esq.
  for Town of Brookfield, CT, et al.
Wake, See, Dimes, & Bryniczka
P.O. Box 777
Westport, CT  06881-0777
    BY FEDERAL EXPRESS

Bruce R. Greene, Esq., et al.
  for historical Eastern Pequot Tribe
Greene, Meyer & McElroy, PC
1007 Pearl Street, Suite 220
Boulder, CO  80302
    BY FEDERAL EXPRESS

Mashantucket Pequot
  Tribal Nation
Tribal Council
P.O. Box 3060
Mashantucket, CT  06339-3060

Mathew Thomas
Chief Sachem
Narragansett Indian Tribe of
  Rhode Island
P.O. Box 268
Charlestown, RI  02813

Alan Russell
(Schaghticoke Indian Tribe
  Petitioner, #239)
c/o Michael J. Burns
57 Pratt Street, Suite 604
Hartford, CT  06103

Assistant Secretary - Indian Affairs
Attn: Office of Federal Acknowledgment
MS 4660-MIB
U.S. Department of the Interior
1849 C Street, NW
Washington, DC  20240
    HAND DELIVERED

Barbara Coen, Esq.
Division of Indian Affairs
Office of the Solicitor
MS 6456-MIB
U.S. Department of the Interior
1849 C Street, NW
Washington, DC  20240
    HAND DELIVERED