**EXHIBIT 9**

Summary under the Criteria for the

Proposed Finding for Federal Acknowledgment

of the

Little Shell Tribe of Chippewa Indians of Montana

Prepared in response to a petition submitted to the Assistant
Secretary - Indian Affairs for Federal acknowledgment that
this group exists as an Indian Tribe.

Approved:  **JUL 1 4** 2000
           _____
                  (date)


Kevin Gover
_____
Assistant Secretary - Indian Affairs

Little Shell (MT): Proposed Finding - Technical Report

Range rate of marriage to Métis was 52 percent and the Highline rate was 46 percent.

For the final cohort studied, individuals born between 1920 and 1939 and marrying between approximately 1940 and 1959 (337 marriages), 23 percent of marriages were with other Métis, 72 percent were with non-Indians, and 5 percent were with other Indians. The rate of marriage to Métis partners appears to have dropped off rapidly among those born in the last ten years of this period.

Although most lines examined showed several marriages to Métis or reservation Indians for individuals born between 1940 and 1960, these were isolated instances, making up less than 3 percent of the total marriages. Consequently, specific rates have not been calculated for this report. There have been few marriages in the past twenty years between two members of the Little Shell Band.

*Past Marriage Rates Based on the Current Little Shell Roll*

Marriage rates were also evaluated by examining the parentage of members on the Little Shell roll as of 1992. The birthdates of individuals on the roll were used as the measure of when a marriage was extant. This approach partly measures the continuation of a marriage past inception, until the birthdate of the youngest child, which the analysis of selected lines above did not do. This measure does not include past marriages which did not result in descendants in the present membership, nor marriages of individuals whose children are all deceased, but does include all of the present membership. Whether this procedure skewed the results was not determined for this report.

Forty-five percent of members born in 1939 had two Métis parents. By comparison, the measurement of marriages in selected lines showed 48 percent of new marriages between 1920 and 1939 were Métis-Métis. Seventeen percent of those on the Little Shell roll who were born in 1959 had two Métis parents. This compares with 20 percent of new marriages between 1940 and 1959 measured in selected lines. The rates obtained based on parentage of those on the roll are consistent with the measure by selected lines.

*Measurements by the Petitioner*

The petitioner (Franklin and Bunte 1994; Franklin 1996) placed great weight on the measurement of marriage rates to demonstrate community because of the provisions of the acknowledgment regulations which provide that if more than 50 percent of the marriages of a group are within the group, this is sufficient in itself to demonstrate community.[99] The petitioner's researchers concluded that the Little Shell had at least 50 percent in-group marriages from the 1880's through at least 1950. None of their analyses attempted to demonstrate whether these marriages were spread out throughout the Little Shell's ancestral population, or limited to subgroups. They did note that marriages between the two regions were infrequent.

---

[99] Section 83.7(b)(2)(ii) of the regulations (25 CFR Part 83).

Little Shell (MT): Proposed Finding - Technical Report

The petitioner, in a report by Franklin and Bunte, reviewed the parentage of all of those on the 1987 Little Shell roll (Franklin and Bunte 1994, 35-36).[100] The rates of Métis-Métis marriage derived through this analysis were generally consistent with those derived by BAR. Franklin's analysis found that Métis-Métis marriages comprised 92 percent of marriages between 1880 and 1910, 63 percent between 1911 and 1940, 22 percent between 1941 and 1970, and 12 percent between 1971 and 1987. The BAR's estimate has the advantage of including the 1990, 1991, and 1992 supplemental rolls as well as including many known marriages in earlier generations with no currently living descendants or where the descendants are not enrolled. Nonetheless, the BAR measure substantially accorded with Franklin's results.

Franklin and Bunte presented a second analysis of the 1987 roll which factored in an estimate of an average length of marriage as 30 years (Franklin and Bunte 1994, table 2). This allowed for the fact that marriages would usually have continued later than the birthdate of the youngest child, the last date counted by the first method he used. This approach yielded a rate of Métis-Métis marriage of 63 percent of marriages in 1940 (the earliest year reported in the their table), 51 percent in 1950, 34 percent in 1960, and 14 percent in 1987. This result is reasonably consistent with the conclusion above that by 1950 new marriages within the group would have fallen below a rate of 50 percent Métis-Métis marriages.

Franklin and Bunte also presented a brief analysis of marriages extant in 1937 by examining the Roe Cloud Roll (Franklin and Bunte 1994, 38-39). They calculated that 82 percent of the marriages of those on the roll were Métis-Métis "in-marriages," counting marriages to Rocky Boy's Chippewa-Cree and Turtle Mountain Band members as the same as marriages with other Métis. Another 7 percent were married to members of other Indian tribes. The Roe Cloud Roll, however, only included a portion of the ancestors of the present membership or of the Métis in Montana that time. The roll does show that there was a large body of Métis individuals intermarried at a rate more or less consistent with the other measures.

Franklin in 1996 revised the petitioner's marriage rates to calculate the percent of married *members* at a given time who were married to another Métis, rather than the percent of such *marriages*. Franklin followed draft acknowledgment guidelines which stated that in-marriages count "twice" because they affect two members of the group.[101] This approach has not been adopted, however, in any previous acknowledgment determinations. The acknowledgment regulations plainly refer to the percent of *marriages*, not the percent of *members* of the group affected. Thus, the percent of *members* participating in in-group marriages is not relevant evidence for the 50 percent

---

[100] It was not determined if this limitation had any effect on their results.

[101] Thus, if 50 percent of the *marriages* of the petitioner's members were to another Métis, then 67 percent of the petitioner's married *members* had married another Métis.

-178-

Little Shell (MT): Proposed Finding - Technical Report

requirement of the regulations.[102]

The number of individuals in a group affected by in-group marriages, however, is relevant in evaluating ordinary evidence for the existence of a social community, under the regulations.[103] In calculating the percent of individuals in a group who marry within it, an in-marriage involves two members of the group, while an out-marriage involves only one. Based on this approach and using the petitioner's 1987 roll, Franklin calculated that the portion of members who were born to marriages between two Métis was 96 percent for members born between 1880 and 1910, 77 percent for 1911 to 1940, 36 percent for 1941 to 1970, and 22 percent for 1971 to 1987 (Franklin 1996, 2).[104] Incorporating the approach of counting the number of members of the group involved in Métis-Métis marriages, rather than the number of such marriages, and adopting an assumption that the length of marriages was 30 years, Franklin estimated that the portion of members with a Métis-Métis marriage was 69 percent in 1949 (the earliest year presented), 50 percent in 1960, and 25 percent in 1987.

The petitioner estimated that the last year when more than 50 percent of Little Shell members marrying were marrying other Métis was 1949, when the rate was 53 percent (Franklin 1996, 4). Franklin, looking at extant marriages and incorporating his estimate of a marriage length of 30 years, estimated that 50 percent of married Little Shell were married to another Métis in 1960, with the percentage declining after that time. The more conservative BAR measure of the parentage of members on the 1992 roll indicates that the late 1930's was the earliest that the portion of the petitioner's new marriages that were between two Métis would have fallen below 50 percent. The percent of Little Shell members marrying another Métis, as opposed to the percent of marriages, would have remained above 50 percent until somewhat later. The BAR's analysis of the parentage of members on the 1992 roll was consistent with its evaluation of selected family lines, which showed that 48 percent of new marriages between 1920 and 1939 were Métis-Métis.

*Marriages to Members of Montana Reservation Tribes*

Only a small percentage of past marriages were with individuals from the federally recognized reservation tribes in Montana, the Rocky Boy's, Blackfeet, Gros Ventre, or

---

[102] Section 83.7(b)(2)(ii) of the regulations (25 CFR Part 83).

[103] Section 83.7(b)(1)(i) of the regulations (25 CFR Part 83).

[104] Based on this approach, the statistics for selected lines analyzed above would be: 96 percent of members of these families marrying between 1880 and 1899 married another Métis. Between 1900 and 1919, approximately 91 percent of those marrying married another Métis. The proportion falls to 65 percent of those marrying between 1920 and 1939. Of those marrying between 1940 and 1959, the percentage of individuals marrying Métis is 38 percent. Using this analysis, assuming a constant rate of decline, new marriages which were Métis-Métis would have fallen below 50 percent of members marrying by approximately 1950.

-179-

Little Shell (MT): Proposed Finding - Technical Report

Assiniboine tribes. However, the data used may be skewed so that these results somewhat underestimate the actual number of historical marriages to reservation Indians. The potential skewing results from the Little Shell Band's prohibtion of dual enrollment with a recognized tribe. As a consequence, some of the descendants of marriages to members of one of the reservation tribes are not on the Little Shell roll, because they are enrolled with the tribe of their non-Little Shell parent (see Franklin and Bunte 1994, 52-54). These unenrolled descendants, and their ancestors, may not show on the genealogical outline of the family line in the FTM, even though they are part of the family lines with members in the petitioner (see below, relationship to reservation Indians).

*Marriage Patterns in the Context of Discrimination and Social Distinction*

Franklin and Bunte concluded that past marriages with non-Indians were much more commonly a Métis woman marrying a white man than vice-versa (Franklin and Bunte 1994, 51). This was true of almost all of the few marriages to non-Indians between 1880 and 1910. The ratio of Métis women versus Métis men marrying non-Indians declined gradually, at the same time as the percent of Métis marrying non-Indians increased. The ratio did not become an even one until 1970, by which time there were almost no Métis-Métis marriages. A systematic pattern of the women of a social group, but not the men, marrying into a high status group is termed "hypergamy." It frequently occurs where one of the two intermarrying groups has a lower status than the other. This historical pattern of Métis marriage to non-Indians lends support for the conclusion that the Métis were regarded by non-Indians in the past as having a lower status and that this view continued, albeit to a diminishing extent, throughout the 1950's and 1960's.

While there were significant barriers to intermarriage resulting from views of the surrounding non-Indian population, oral histories and interviews indicated that there was no barrier from the point of view of the Métis families to marriage to white non-Indians within the lifetime of living individuals (FD 1998). This applied to marriages either with non-Indians or with reservation Indians. This attitude was almost universally reported by adults who grew up in the "moccasin flat" era, notwithstanding the discrimination experienced in that era. These accounts report attitudes after 1920 and are consistent with increasing frequency of marriage to non-Indians after that time. Two individuals in their sixties stated, however, that their parents would have preferred that they had married another Métis rather than marrying non-Indians as they did (Allen 1998; G. Azure 1998).

Franklin and Bunte argued in part that the increase in out-marriage resulted from the Métis lines having become so intermarried that individuals had become so closely related that there were no longer eligible marriage partners within the group. The analysis of selected family lines above indicates that the number of Métis family lines "available" for marriage was very large and that it is unlikely that potential Métis marriage partners were not available.

-180-

Little Shell (MT): Proposed Finding - Technical Report

*Conclusions*

Intermarriage among the Métis generated numerous links between Métis families within the two geographical regions. The complete distribution of these links within each region, however, could not be determined in adequate detail from the petitioner's or BAR's analysis. This analysis was sufficient to demonstrate, along with other kinds of evidence, that the two regions were substantially separate. It also demonstrated the existence of substantial blocs of linked families within each region, but not to the extent that an entire region may have been linked together. This analysis did not demonstrate whether there were multiple communities within the regions, or the extent to which there were families ancestral to the petitioner which had few or no marriage ties to other such families.

The patterns of marriage and high rates of Métis-to-Métis marriage before the 1940's indicate that those marriages were occurring within a population of individuals with extensive social contact with each other. These patterns and rates of marriage also appear to reflect circumstances where there were likely strong social boundaries against marriage and interaction outside of the population because of cultural and social differences between the French-Indian Catholic Métis and the largely Protestant Anglo-American settlers around them. The intensity of marriage indicates that other social ties besides marriage existed, since it is unlikely that such extensive marriage would have occurred without a social context for marriage partners to become acquainted. Although the social context for the period of extensive Métis-Métis marriage in Montana has not been completely developed for this report, the localization of marriage partners within regions strongly indicates a high degree of local social contact among Métis, a fact consistent with the limited available descriptions of Métis social life up until the 1930's as described earlier in this report.

## Social Relationships and Social Interaction, 1950 - 1993

*Introduction*

None of the petition narratives present a detailed description of the existence of social community among the petitioner's members and ancestors between 1950 and 1993. Franklin and Bunte's 1994 report assumed that section 83.8, which applies to previously-acknowledged groups, applies to the Little Shell case, which would mean that the petitioner would not have to demonstrate the existence of historical community (Franklin and Bunte 1994, 31). Franklin and Bunte therefore focused much of their argument about community on demonstrating the existence of a community at present, although they described some historical evidence to support their discussion of a modern-day community. Beyond that, they depended on arguments for high rates of marriage within the group, as well as members' continuing cultural differences and social distinctions from non-Indians. As a consequence, there is not a focused presentation in Franklin and Bunte's report describing community between 1950 and 1993.

-181-