# EXHIBIT Q



# Fax

| | | | |
|---|---|---|---|
| **To:** | Jeff Sienkiewicz | **From:** | Town of Kent |
| **Fax:** | 355-4439 | **Pages:** | 8 |
| **Phone:** | | **Date:** | 3/31/2005 |
| **Re:** | Recognition | **CC:** | |

☐ **Urgent**     ☐ **For Review**     ☐ **Please Comment**     ☐ **Please Reply**     ☐ **Please Recycle**

• **Comments:**

Dear Jeff:

    Ken Cooper of TASK brought this to my attention and asked me to show it to you. I have not read it as of this fax. I'll call you late Friday. I will be out all day.


PLAINTIFF'S DEPOSITION EXHIBIT
STN-28
7/20/05 SAR

```
Federal Register: March 31, 2005 (Volume 70, Number 61)]
[Notices]
[Page 16513-16516]
From the Federal Register Online via GPO Access [wais.access.gpo.gov]
[DOCID:fr31mr05-82]
```

-----------------------------------------------------------------------

DEPARTMENT OF THE INTERIOR

Bureau of Indian Affairs


Office of Federal Acknowledgment; Reports and Guidance Documents; Availability, etc.

AGENCY: Bureau of Indian Affairs, Interior.

ACTION: Notice.

-----------------------------------------------------------------------

SUMMARY: The Department gives notice that the Associate Deputy Secretary of the Interior is revising and clarifying certain internal procedures for managing and processing petitions for Federal acknowledgment as an Indian tribe. These revisions do not change the acknowledgment regulations, 25 CFR part 83.

DATES: Effective Date: The procedures defined by this notice are effective on March 31, 2005.

FOR FURTHER INFORMATION CONTACT: R. Lee Fleming, Director, Office of Federal Acknowledgment, MS: 34B-SIB, 1951 Constitution Avenue, NW., Washington, DC 20240, phone (202) 513-7650.

SUPPLEMENTARY INFORMATION:

Introduction

   The Department publishes this notice in the exercise of authority under 43 U.S.C. 1457, 25 U.S.C. 2 and 9, 5 U.S.C. 552(a), 5 U.S.C. 301, and under the exercise of authority which the Secretary of the Interior delegated to the Assistant Secretary--Indian Affairs (Assistant Secretary) by 209 Department Manual 8.
   This notice supersedes the notice published in the Federal Register (65 FR 7052) on February 11, 2000, entitled ``Changes in the Internal Processing of Federal Acknowledgment Petitions.''
   By Secretary's Order No. 3259, dated February 8, 2005, the Secretary delegated to the Associate Deputy Secretary most of the duties formerly delegated to the Assistant Secretary. (This delegation will expire upon confirmation of a new Assistant Secretary or designation of an Acting Assistant Secretary.) Among the delegated authorities is the authority to, ``execute all documents, including regulations and other Federal Register notices, and perform all other duties relating to Federal recognition of Native American Tribes.''
   The acknowledgment process is based on the regulations in 25 CFR Part 83, first issued in 1978 and revised in 1994. The acknowledgment

function, formerly under the Branch of Acknowledgment and Research in the Bureau of Indian Affairs (BIA), was relocated to the Office of Federal Acknowledgment in the Office of the Assistant Secretary--Indian Affairs effective July 27, 2003.

*[handwritten annotation: Not BAR but OFA 7/27/03]*

The General Accounting Office (now the Government Accountability Office) published on November 2001 a report entitled ``Improvements Needed in Tribal Recognition Process.'' In response to this report, the Department adopted a Strategic Plan, dated September 12, 2002, to identify ways to improve the timeliness and transparency of the acknowledgment process. That plan called for consideration of possible changes in the processing of acknowledgment petitions. This notice presents some of the results of that planning process.

As part of its plan, the Department also provided for a review of a notice of ``Changes in the Internal Processing of Federal Acknowledgment Petitions'' published by the Assistant Secretary in the Federal Register (65 FR 7052) on February 11, 2000. In that notice, the Assistant Secretary changed certain internal procedures and clarified other procedures, within the parameters of the regulations. That notice directed BIA to adopt certain procedural changes in order to reduce delays in reviewing petitions for acknowledgment and to make acknowledgment decisions in a more timely manner. <u>This notice supersedes the notice of February 11, 2000</u>.

The procedures described in this notice are based on five years of experience under the notice of February 11, 2000, and on the procedures that have been found most effective in producing the clearest decisions in an efficient manner, while giving petitioners and third parties appropriate opportunities to provide information and comment. These procedures are in accord with the commitment to the principle, stated by the Secretary in her April 1, 2004, memorandum to the Assistant Secretary, that acknowledgment decisions be based on documentation ``carefully reviewed in

[[Page 16514]]

accordance with regulatory standards and then made available to the public in a transparent and timely manner.'' The Secretary stressed the importance of ``thorough and deliberate evaluations'' because acknowledgment decisions ``must be equitable and defensible.''

The <u>internal procedures stated in this notice do not change the acknowledgment regulations</u>. Rather, they provide a better means of implementing the existing regulations and managing the agency's workload within the parameters of the regulations and available resources. These procedures apply to the Office of Federal Acknowledgment.

This Federal Register notice is to advise petitioners, interested parties, and the public of the internal procedural changes adopted by the Department as part of its response to the GAO report. It also provides them with certain information and guidance to promote transparency in the acknowledgment process and timeliness in the processing of acknowledgment petitions. Petitioners and interested parties will be provided a copy of this notice by first class mail.

Regulatory Procedures

Under the regulations, the petitioner has the burden to present evidence that it meets the mandatory criteria. Section 83.6(c) of the acknowledgment regulations provides that ``the documented petition must

include thorough explanations and supporting documentation in response to all of the criteria.'' Section 83.6(d) provides that a petition can and will be turned down for lack of evidence.

The regulations, in Sec. 83.5(c), describe the duties of the Department, in part, by stating that: ``The Department shall not be responsible for the actual research on the part of the petitioner.'' Section 83.10(a) of the regulations provides that the Assistant Secretary ``may * * * initiate other research for any purpose relative to analyzing the documented petition and obtaining additional information about the petitioner's status.'' This language makes additional research on the part of the Assistant Secretary discretionary and does not mandate that any additional research be carried out.

The notice of February 11, 2000, limited research by the acknowledgment staff to that needed to verify and evaluate the ``materials presented by the petitioner and submitted by third parties.'' This notice removes that specific limitation, while reaffirming the importance of timely reviews of the evidence by the acknowledgment staff. Consistent with that limitation, acknowledgment staff members have performed research--including archival, library, and field research--and analysis as necessary to verify and evaluate the arguments and evidence presented by the petitioner or third parties. Such expert research shall continue to be done. The acknowledgment staff may undertake some research or analysis beyond the arguments and evidence presented by the petitioner or third parties, at the discretion of the Department, only when consistent with producing a decision within the regulatory time period. This notice clarifies that the acknowledgment staff may acquire relevant and easily accessible documents not already in the record and may interview knowledgeable informants not already interviewed for the record. Research to obtain additional information that clarifies the issues in a case can speed the evaluation of a petition. Research to acquire relevant information not accessible to the parties or overlooked by the parties by using the professional expertise of the acknowledgment staff can aid the determination of whether the petitioner meets the regulatory criteria for acknowledgment and provide a clearer basis for the decision. Petitioners and third parties, however, have no expectation that the acknowledgment staff will perform additional research or analysis to correct omissions in their submitted documentation. The burden under the regulations remains on the petitioner to demonstrate that it meets the criteria.

The notice of February 11, 2000, provided that materials submitted after the start of active consideration would not be reviewed for the proposed finding, but would be reviewed for the final determination. This notice modifies that direction. In the future, when the Department notifies the petitioner and third parties that a petition will be placed on active consideration on a specific date, it also will notify them of a date by which additional material must be submitted to be considered for the proposed finding. The Department will provide a 60-day time period for such submissions. Unsolicited submissions after that date will be reviewed for the final determination and not for the proposed finding, with the following exception. Section 83.10(f)(2) of the regulations provides that the petitioner ``shall be notified of any substantive comment on its petition received prior to the beginning of active consideration or during the preparation of the proposed finding and shall be provided an opportunity to respond to such comments.'' A petitioner's response to substantive comments on its petition will be

considered for the proposed finding if submitted within 60 days of its notification by the Department of the receipt of any substantive comments that will be considered for the proposed finding, or within 60 days of the date by which additional materials had to be submitted to be considered for the proposed finding, whichever is later, even if active consideration has begun. The petitioner and third parties retain the opportunity under the regulations to comment on each other's submissions during the public comment period that follows the proposed finding.

The notice of February 11, 2000, stated that the acknowledgment staff ``shall not request additional information from the petitioner and third parties during the preparation of the proposed finding.'' This notice modifies that limitation. Consistent with that limitation, acknowledgment researchers have requested and reviewed documents and analyses that were incomplete as submitted, available in a more usable form than that submitted, or referenced but not submitted. Acknowledgment staff may request additional information from the petitioner or third parties at any time prior to the proposed finding in order to clarify the arguments or evidence submitted by those parties, or to obtain information in the possession of the petitioner or third parties that was not submitted. The proposed finding, however, shall not be delayed to obtain this information.

The notice of February 11, 2000, directed that ``technical reports such as have been prepared in the past'' by the acknowledgment staff, which often consisted of multiple technical reports reflecting the approaches of different professional disciplines, should no longer be prepared to accompany the summary evaluation of the evidence under the criteria as part of the report required by Sec. 83.10(h) of the regulations. Consistent with that limitation, new forms of charting, arranging, and describing the available evidence under each criterion have been used. This notice clarifies the notice of February 11, 2000, by providing that, in addition to a summary under the criteria, the Department may prepare a technical report, where appropriate, to memorialize the analysis of the evidence that is the basis of the summary evaluation in order to enhance the transparency of the decision. Such a report should not describe all of the evidence submitted, but should focus on the evidence most important to the decision-making process. It remains the

[[Page 16515]]

policy of the Department to provide a complete explanation of the basis for acknowledgment decisions.

The notice of February 11, 2000, provided that Departmental review of recommended decisions, including signature by the Assistant Secretary, ``is to take no more than six weeks from the time the draft recommendation leaves the Branch of Acknowledgment and Research office and enters the surname process.'' This notice clarifies the notice of February 11, 2000, by stating that, consistent with practice under that notice, the 6-week limitation does not apply to the processes of consultation and briefing by the Office of Federal Acknowledgment that should continue to occur with the Office of the Assistant Secretary-- Indian Affairs and the Office of the Solicitor prior to the start of the Department's surname process. The timely processing of acknowledgment petitions will be improved more by such earlier consultation and briefing than by limiting the time period for Departmental review. In addition, the reorganization of the

acknowledgment function into the Office of the Assistant Secretary--Indian Affairs has reduced the need for a specified time frame for the surname process and improved the timeliness of the processing of acknowledgment petitions by reducing the number of levels of Departmental review.

Certain statements about the Department's procedures contained in the notice of February 11, 2000, are clarified and reaffirmed here:

A proposed finding represents the agency's conclusions at the time that finding is made, based on the evidence in the record. One purpose of the comment period on the proposed finding is to give the petitioner and third parties an opportunity to present additional evidence in response to the findings on the petition. Submissions by the petitioner and third parties during the comment period, rather than research by the acknowledgment staff, are the most appropriate and efficient means to supplement the record of the petition.

The review of a petition is to be conducted by a team of professional researchers working in consultation with each other. The acknowledgment decision is not intended to be a definitive study of the petitioning group. The acknowledgment staff is expected to use its expertise and knowledge of sources to evaluate the accuracy and reliability of the submissions, but to conduct its professional review within the constraints of time established by the regulations and the resources available. The acknowledgment researchers are not expected to conduct extensive analysis of data that petitioners or third parties submitted but did not analyze. The acknowledgment researchers are not expected to conduct additional research and analysis in preparation for any anticipated challenge in court. The scope of the staff's professional review shall be limited to that necessary to establish whether the petitioner has met its burden to establish by a reasonable likelihood of the validity of the facts that it meets all seven regulatory criteria.

Section 83.6(a) of the regulations states that a petition may be ``in any readable form that contains detailed, specific evidence.'' In some instances, materials submitted by the petitioner or a third party are poorly organized, do not identify the sources or even the nature of the documents provided, or cannot be identified from the source cited in the text submitted by the petitioner or third party. The Department may consider such materials, either in whole or in part, as not being in a ``readable form'' within the meaning of the regulations, and acknowledgment researchers shall not expend more than a reasonable amount of time attempting to identify the source or sources of documentary materials submitted without such information. Therefore, it is important for the petitioner and third parties to cite clearly the source(s) for each document submitted in order for it to be given appropriate weight as evidence.

Information and Advice for Petitioners and Third Parties

In accordance with the Department's Strategic Plan of September 12, 2002, the Office of Federal Acknowledgment has created a compilation of all of the Department's acknowledgment decisions in order to promote transparency in the acknowledgment process. This compilation contains all proposed findings, final determinations, and reconsidered final determinations, including their summaries under the criteria, technical reports, charts, supporting materials, and Federal Register notices, plus technical assistance letters to petitioners and Departmental correspondence relating to issues referred by the Interior Board of

[handwritten margin note: some part of Feb. 11 are confirmed]

Indian Appeals in acknowledgment cases. This compilation will be periodically updated to include future completed cases. This ``Acknowledgment Decisions Compilation'' is available to petitioners, third parties, and the public on compact disk (CD).

The Department's Strategic Plan also included consideration of possible changes in acknowledgment procedures. From this review, the Department has identified several ways in which the timeliness and transparency of the acknowledgment process could be improved, both by providing petitioners and third parties with a better understanding of its policies and by suggesting certain practices that could be voluntarily adopted by petitioners and third parties in the absence of changes to the regulations. In accordance with the Strategic Plan, the Department reviewed whether petition data could be entered into a computerized system, whether a standard format could be adopted for the submission of petitions, whether letters of intent should include the submission of governing documents and membership lists, whether third parties could receive non-privacy documents without invoking the Freedom of Information Act (FOIA), whether possible impediments to the orderly consideration of petitions such as extensions of time could be resolved, and whether other possible changes in procedures could improve the administration of the acknowledgment process. The following information and suggestions resulted from this review.

The Office of Federal Acknowledgment has used a computer database system (known as FAIR) as a pilot project in several cases. This system is intended to make the evidentiary record, and the Department's analysis of that evidence, more accessible to petitioners and third parties by allowing them to obtain that record on compact disk (CD). This system holds scanned images of all the documents in the administrative record for a petition and provides on-screen, computerized access to those documents. It allows the evidence for a petition to be sorted and retrieved, and thus improves the ability of petitioners and third parties to find and view specific documents cited in the Department's findings or in the submissions of other parties. The acknowledgment staff is available to provide assistance to petitioners and third parties about the use of this electronic database system.

Petitioners are encouraged to consult with the acknowledgment staff before and during preparation of a documented petition in order to improve the quality of the petition, reduce the number of deficiencies noted in a technical assistance letter, and thus improve the timeliness of the acknowledgment process. Petitioners and third parties are advised to consult with the

[[Page 16516]]

acknowledgment staff before using genealogical, database, or other computer software programs in order to maximize compatibility with systems in use within the Office of Federal Acknowledgment. Petitioners and other parties may submit petition materials in an electronic format, such as images of documents, and consult with the acknowledgment staff to prepare for the inclusion of their petition in the FAIR system. Consultation before preparation of petition materials will facilitate compatibility and thereby speed the review of petitions.

The acknowledgment staff is available to provide technical assistance to petitioners and third parties, but can understand the organization and composition of a petitioning group and its governing

body only if the group's governing documents and membership roll are provided. Therefore, these documents should be submitted as soon as possible, preferably with the letter of intent, in order for the acknowledgment staff to provide effective and timely technical assistance. These items are required elements of a documented petition under Sec. 83.7(d) and (e). As part of their comments on a proposed finding, petitioners should submit an updated membership roll, certified by their governing body. The petitioner should include an explanation of any changes in its membership criteria and/or enrollment procedures and any substantial changes in its membership since the proposed finding. Petitioners are reminded that, under Sec. 83.11(b), if they are acknowledged, this list will become the group's base membership roll.

   In order to promote timeliness and transparency in the acknowledgment process, especially during the period between a determination that a documented petition is ready for active consideration and publication of a proposed finding, <u>petitioners are encouraged to provide a copy of the non-privacy materials in their submissions to the Department directly to the State Attorney General's Office</u> and any <u>recognized tribe that is an interested party in their petition</u>, and third parties are encouraged to provide a copy of their submissions to the Department directly to the petitioner, the State Attorney General's Office, and any recognized tribe that is an interested party. This request does not change the regulatory requirement, in Sec. 83.10(i), that third parties who submit arguments and evidence to the Assistant Secretary on the proposed finding must provide a copy of their submissions to the petitioner. This guidance does not create any rights in petitioners or third parties to obtain information or respond to it. Such <u>voluntary, reciprocal exchanges with other parties may improve the ability</u> of those <u>parties to submit timely comments</u>. If the Department is able to include an evaluation of such submissions in a proposed finding, then all parties will be able to reply to that evaluation during the comment period. These reciprocal exchanges also would improve the ability of all parties to comment after a proposed finding on any materials submitted too late to be considered for the proposed finding. If such exchanges eliminate a need for parties to submit FOIA requests, they should reduce the collateral duties of the acknowledgment staff and thus speed the Department's processing of acknowledgment petitions.

[margin note: voluntary]

   The regulations provide, in Sec. 83.10(i), that the comment period that follows a proposed finding ``may be extended for up to an additional 180 days at the Assistant Secretary's discretion upon a finding of good cause.'' The Department has interpreted the regulations as providing for more than one extension. It has been the policy of the Department that the finding of ``good cause'' for any extension will depend on the specificity of the description of work that will be done if additional time is permitted, the explanation for why the research and analysis were not completed during the initial comment period or prior extension, and the amount of additional time requested. Any requests for extensions should be made appropriately in advance of the expiration of the initial or extended comment period, and petitioners and third parties should not assume that such extensions will be granted either in whole or in part. While extensions of the comment period will be granted on a showing of good cause, if, because of such an extension, a petition is not ready for evaluation for a final determination when the acknowledgment staff is available to be assigned to it, the Department will proceed to evaluate another petition. The

Department cannot allow delay on one petition to cause delay on other petitions.

The Department advises petitioners, third parties, and their representatives not to contact the Associate Deputy Secretary or any other Department official who may have been delegated authority to decide matters concerning the acknowledgment petition during the last 60 days of the regulatory time period provided for the issuance of a proposed finding or final determination. During the active consideration of a petition, the petitioner and third parties may contact the supervisor of the acknowledgment staff (see the contact information above) regarding the status of the petition.

Under Sec. 83.5 of the regulations, the Associate Deputy Secretary, or the Assistant Secretary, as appropriate, shall supplement or update the acknowledgment guidelines as necessary. The advice in this notice supersedes the existing guidelines for preparation of documented petitions where they may be in conflict.

These revised procedures and guidance are effective on March 31, 2005.

Dated: March 10, 2005.
James E. Cason,
Associate Deputy Secretary.
[FR Doc. 05-6325 Filed 3-30-05; 8:45 am]

# EXHIBIT R

Westlaw.

Slip Copy

Page 1

Slip Copy, 2005 WL 806719
(Cite as: Slip Copy)

**H**
Slip Copy, 2005 WL 806719
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
In re PE CORPORATION SECURITIES
LITIGATION.
No. 3:00 CV 705 CFD TPS.

April 8, 2005.

Brian C. Fournier , Hurwitz Sagarin & Slossberg , Milford, CT, Carlos F. Ramirez , Milberg Weiss Bershad & Schulman-Ny , New York, NY, David A. Slossberg , Hurwitz Sagarin & Slossberg , Milford, CT, Elias A. Alexiades , New Haven, CT, J. Daniel Sagarin , Hurwitz Sagarin & Slossberg , Milford, CT, Lee A. Weiss , Milberg, Weiss, Bershad, Hynes & Lerach , New York, NY, Margaret E. Haering , Hurwitz & Sagarin , Milford, CT, Sanford P. Dumain , Milberg, Weiss, Bershad, Hynes & Lerach , New York, NY, Marvin L. Frank , Murray Frank & Sailer , New York, NY, Jeffrey S. Nobel , Schatz & Nobel-Htfd, Hartford, CT, for Plaintiffs.
Kevin D. Lewis , Michael J. Chepiga , Simpson, Thacher & Bartlett , New York, NY, Michael P. Shea , Day, Berry & Howard-Htfd-Ct Cityplace I , Hartford, CT, Robert A. Bourque , Simpson, Thacher & Bartlett , New York, NY, Stanley A. Twardy, Jr. , Terence J. Gallagher, III , Thomas D. Goldberg , Day, Berry & Howard , Stamford, CT, William M. Regan , Simpson, Thacher & Bartlett, New York, NY, for Defendants.
John B. Hughes, New Haven, CT, for USA.

*RULING ON PLAINTIFFS' MOTION TO COMPEL*

THOMAS P. SMITH, Magistrate Judge.
*1 The lead plaintiffs, David Berlin and Vinh Voung, on behalf of a class consisting of all persons other than the defendants who purchased the common stock of PE Corporation-Celera Genomics Group ("Celera") in a February 29, 2000 secondary public offering conducted by PE Corporation ("PE"), commenced this shareholder action against the defendants, PE and certain officers and directors, alleging that the registration statement and prospectus prepared in connection with the secondary public offering were false and misleading because Celera did not disclose failed negotiations between it and the federally-funded Human Genome Project ("HGP") in violation of sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Pending before the court is the plaintiffs' Motion to Compel the Testimony of Dr. Francis Collins, and to extend the discovery deadline solely for the purpose of conducting this deposition. (**Dkt.# 112**). The plaintiffs' motion is **GRANTED** and the discovery deadline is hereby extended forty-five days from the date of this ruling for the purpose of conducting this deposition.

### BACKGROUND

Celera, a subsidiary of PE, began sequencing the human genome in 1999. (Am.Compl.¶¶ 7, 17). Its strategy was to sequence the genome and then "use the genomic information derived from its genomic sequencing program as a platform upon which to develop an integrated information and discovery system." (*Id.* ¶ 20). To implement this strategy, Celera required exclusive patent protection for a period of five years. (*See id.* ¶ 25). By January 2000, it announced that it had sequenced 90% of the human genome. (*Id.* ¶ 17).

At the same time, other companies were pursuing the same ends; most significantly, the HGP, "a worldwide coordinated effort ... sponsored by governments and nonprofit organizations in the United States, England, Japan, and France, among other nations." (*Id.* ¶ 18). The HGP intended to make its findings publically available. As such, a " race" to map the human genome ensued. (*Id.* ¶ 19).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 2

Slip Copy, 2005 WL 806719
(Cite as: Slip Copy)

Because Celera's competitive position was dependant upon its ability to obtain patent protection, it entered into discussions with the HGP regarding a possible collaboration on the project. (Id. ¶ 21, 24). However, such coaction never materialized. (Id.). The plaintiffs argue that because the governments that supported the HGP opposed broad patent protection, such as Celera required, Celera's "ability to obtain protection from the immediate release of the human genome code, in the face of such opposition, was very attenuated and subject to increased and substantial risk." (Id. ¶ 26).

On or about February 29, 2000, PE filed with the Securities and Exchange Commission ("SEC") for a secondary offering. (Id. ¶ 32). The prospectus became effective and PE sold over 4 million shares for gross proceeds of approximately $944 million. (Id. ¶ 34). While most of the common stock was purchased for $225.00 per share, it has since significantly decreased in value, now selling for approximately eleven dollars. (Id.).

*2 Generally, the plaintiffs argue that the registration statement and several sections of the prospectus issued in connection with the secondary offering were materially false and misleading in light of the fact that Celera would unlikely be able to obtain the requisite patent protection due, in large part, to their competition with and inability to collaborate with the HGP. (Id. ¶¶ 32-48). Specifically, they point to a single undisclosed meeting between senior members of Celera's management and four representatives of the HGP that was held on December 29, 1999 at a hotel near Dulles Airport. (Pl.s' Mem. Supp. Mot. at 1-2). The pending motion seeks to compel the deposition testimony of Dr. Collins, Director of the Human Genome Research Institute, National Institutes of Health ("NIH"), Department of Health and Human Services ("DHHS"), and the lead negotiator for the HGP at this meeting.

On July 2, 2004, the plaintiffs served Dr. Collins with a subpoena to take his deposition under Rule 45 of the Federal Rules of Civil Procedure. (Id. at 2). On July 9, 2004, the plaintiffs received a letter from Attorney Paul J. Robertson of the DHHS, which oversees the NIH, advising them of the DHHS's "obligations and responsibilities in proceedings in which the United States is not a party" under 45 C.F.R. Part 2, and referring the plaintiffs to Dr. Elias Zerhouni, Director of the NIH. (Fournier Aff., 10/12/04, Ex. A at 1).

On July 15, 2004, plaintiffs' counsel wrote a letter to Dr. Zerhouni requesting permission to take the deposition of Dr. Collins. (Fournier Aff., 10/12/04, Ex. B). The plaintiffs received a letter dated August 6, 2004 from Dr. Raynard S. Kingston, Deputy Director of the DHHS, denying their request due to their purported failure "to demonstrate how Dr. Collins' testimony will promote the objectives of the [DHHS]" and to "sufficiently explain why the testimony sought from Dr. Collins is not available through other means." (Fournier Aff., 10/12/04, Ex. C at 1).

In a letter dated August 20, 2004, plaintiffs' counsel requested that the DHHS reconsider its denial of their request, claiming that the testimony sought from Dr. Collins could not in fact be obtained from any other source. (Fournier Aff., 10/12/04, Ex. D). The plaintiffs supported their claim with the deposition testimony of Dr. Robert Waterston, another HGP participant in the negotiations with Celera, who testified, among other things, that Dr. Collins was one of the individuals primarily in contact with Celera during the days leading up to the December 29 meeting and was the most knowledgeable person on the HGP side of the talks. (Id.).

On September 27, 2004, after a telephone conversation with Attorney Robertson wherein he indicated that the DHHS was not inclined to produce Dr. Collins for a deposition, plaintiffs' counsel sent a letter to Attorney Robertson offering to limit the scope and duration of Dr. Collins's deposition. (Fournier Aff., 10/12/04, Ex. E).

*3 In a second letter dated September 27, 2004, Dr. Kingston denied the plaintiffs' request for reconsideration. (Fournier Aff., 10/12/04, Ex. F). On October 12, 2004, the plaintiffs filed this Motion to Compel the Testimony of Dr. Francis Collins, and to extend the discovery deadline solely

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 3
Slip Copy, 2005 WL 806719
**(Cite as: Slip Copy)**

for the purpose of conducting this deposition.

### DISCUSSION

The DHHS, like many other federal agencies, has enacted what are known as Touhy regulations, FN1 which are derived from the federal "housekeeping" statute, which provides, in relevant part, that: "The head of an Executive department ... may prescribe regulations for the ... conduct of its employees ... and the custody, use, and preservation of its records, papers and property." 5 U.S.C. § 301. The regulation at issue in this case, which applies to any legal proceeding to which the United States is not a party, states that:

> FN1. The regulations earned their name from the Supreme Court case which validated the federal government's power to create "housekeeping" rules that allow it to prevent its employees from providing evidence in private actions. *United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951). In *Touhy,* a state prisoner who had instituted a federal habeas corpus proceeding caused a subpoena *duces tecum* to be served on an agent of the Federal Bureau of Investigation ("FBI"). Touhy sought to have produced certain records that he claimed would serve as evidence that his conviction was brought about by fraud. Relying on a regulation adopted by the Department of Justice pursuant to a predecessor "housekeeping" statute, the agent declined to produce the records. The regulation required subordinates in the Department served with a subpoena *duces tecum* to disobey the subpoena except in the discretion of the Attorney General. For his disobedience, the FBI agent was found guilty of contempt in the district court. The order of contempt was reversed by the Court of Appeals for the Seventh Circuit. In affirming the Seventh Circuit, the Supreme Court concluded that the Attorney General's regulation was appropriate, reasoning that: "When one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas *duces tecum* will be willingly obeyed or challenged is obvious." *Id.* at 468.

No employee or former employee of the DHHS may provide testimony or produce documents in any proceedings to which this part applies concerning information acquired in the course of performing official duties or because of the person's official relationship with the Department unless authorized by the Agency head pursuant to this part based on a determination by the Agency head, after consultation with the Office of the General Counsel, that compliance with the request would promote the objectives of the Department.45 C.F.R. § 2.3. The regulation also specifies the manner by which a party to a litigation may obtain the testimony of a DHHS employee:

> All requests for testimony by an employee or former employee of the DHHS in his or her official capacity ... must be addressed to the Agency head in writing and must state the nature of the requested testimony, why the information sought is unavailable by any other means, and the reasons why the testimony would be in the interest of the DHHS or the federal government.

45 C.F.R. § 2.4(a). The purpose behind such regulations is to "conserve governmental resources where the United States is not a party to a suit, and to minimize governmental involvement in controversial matters unrelated to official business." *Boron Oil Co. v. Downie,* 873 F.2d 67, 70 (4th Cir.1989) (citing *Reynolds Metals Co. v. Crowther,* 572 F.Supp. 288, 290 (D.Mass.1982)). The plaintiffs claim to have fulfilled their obligations under the DHHS's Touhy regulations. (Pl.s' Mem. Supp. Mot. at 7-9). The DHHS disagrees, and asserts that even if the plaintiffs did fulfill their Touhy obligations, it remains within its discretion to deny their request to depose Dr. Collins in accordance with the "arbitrary and capricious" standard of review established by the Administrative Procedure Act of 1946 ("APA").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 4

Slip Copy, 2005 WL 806719
(Cite as: Slip Copy)

(Mem. Opp'n Mot. to Compel at 5, 11). Furthermore, the defendants oppose the plaintiffs' motion on the grounds that it is untimely and seeks unnecessary and duplicative discovery. (Defs.' Resp. & Partial Opp'n at 2). The court is persuaded that the plaintiffs have complied with their obligations under 45 C.F.R. § 2.4(a) and declines to apply the standard of review furnished by the APA. The court also finds the testimony sought from Dr. Collins to be neither unnecessary nor duplicative.

A.

*4 The plaintiffs' July 15, 2004 request to Dr. Zerhouni clearly described the nature of the requested testimony, which relates to the negotiations between Celera and the HGP spanning a three to four month period and the resulting meeting that took place on December 29, 1999. (Fournier Aff., 10/12/04, Ex. B at 1-2). The plaintiffs also claimed that the discovery sought from Dr. Collins could not be obtained by any other means because

> he played a lead role in the negotiations between Celera and the HGP, including at the December 29, 1999 meeting, which lie at the core of plaintiffs' allegations. Also, as director of the National Human Genome Research Institute, which oversees the HGP, Collins was involved at the very highest levels of the negotiations and would certainly have more knowledge of the talks than anyone else on the government side.

(Id. at 2). Dr. Kingston replied in his initial rejection of August 6, 2004 that the plaintiffs " failed to sufficiently explain why the testimony sought from Dr. Collins is not available through other means" since "there were several individuals that were party to the discussion(s) at issue. Those individuals could be called to testify as to what occurred during these meetings." (Fournier Aff., 10/12/04, Ex. C at 1). The plaintiffs countered in their August 20, 2004 request for reconsideration with deposition testimony from Dr. Waterston, who often deferred to others, particularly Dr. Collins, regarding questions on the specifics of the meeting in question and could recall, for example, neither Celera's position regarding reach-through patent rights nor details of a discussion concerning whether a public announcement should be made that the meeting took place, both relevant issues to the plaintiffs' shareholder action. (Fournier Aff., 10/12/04, Ex. D; Ex. G, Waterston Dep., at 82, 84).

Moreover, Dr. Waterston testified at his deposition-the transcript of which was offered to Dr. Kingston in the plaintiffs' request for reconsideration-that Dr. Collins was one of only a handful of people involved from the very outset of negotiations to collaborate with Celera (Fournier Aff., 10/12/04, Ex. G, Waterston Dep., at 37); Dr. Collins appears to be the only participant in a telephone conversation with Dr. Craig Venter, President of Celera, one day before the December 29 meeting, during which Dr. Venter expressed dissatisfaction with a "Shared Principles" document drafted by the HGP and forwarded to Celera in anticipation of the meeting (Id. at 69-73); and Dr. Collins was privy to discussions with other NIH officials concerning events surrounding the falling out between Celera and the HGP, to which Dr. Waterston was not. (Id. at 160-61). The plaintiffs' characterization of Dr. Collins as the leader of the government effort to collaborate with Celera is further supported by testimony from Dr. Harold Varmus, then Director of the NIH, who testified at his deposition that Dr. Collins was "the leader of our team of four" and "took the lead in the [meeting.]" (Fournier Aff., 10/12/04, Ex. H, Varmus Dep., at 98, 104).

*5 Despite this new information, Dr. Kingston maintained in his second denial of September 27, 2004 that the plaintiffs "have not sufficiently explained why Dr. Collins' memory would be any better than the individual(s) who has or will testify or any contemporaneous documents produced." FN2 (Fournier Aff., 10/12/04, Ex. F at 1). How the plaintiffs could establish whether Dr. Collins has a better memory of the relevant events than other participants in the discussions without deposing him one is left to wonder. Regardless, this is not the standard by which the court evaluates the plaintiffs' motion. Instead, the court looks to whether the plaintiffs have satisfied the requirements of 45 C.F.R. § 2.4(a), particularly, whether the testimony sought from Dr. Collins is available through other means. Given the undisputed leading role Dr.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 5
Slip Copy, 2005 WL 806719
(Cite as: Slip Copy)

Collins played in the discussions between the HGP and Celera, the deference shown to him by Drs. Waterston and Varmus when asked about key aspects of the December 29 meeting (*See, e.g.,* Fournier Aff., 10/12/04, Ex. G, Waterston Dep., at 84-92), and his participation in relevant discussions to which others were not privy, the plaintiffs have adequately demonstrated that Dr. Collins's deposition testimony is not in fact available through other means.

> FN2. Dr. Kingston further noted in this second denial of September 27, 2004 that
> [i]t appears that what [plaintiffs] really desire is to examine all the Federal officials that were present at these meetings or involved in these matters. If NIH were to allow this to happen in every case in which NIH was not a party, and in which every plaintiff or defendant believed NIH could be helpful, it would become increasingly difficult for us to effectively and efficiently conduct NIH official business.
> (*Id.*). Numerous individuals affiliated with the HGP were involved at various levels in formulating its negotiating position with Celera. For example, an email from Dr. Collins thanking participants in "[a] conference call about possible next steps in exploring a collaborative next step with Celera" six days prior to the December 29 meeting was addressed to ten other people. (Fournier Aff., 11/19/04, Ex. F). To date, the plaintiffs have not deposed a single current DHHS employee, and the only person besides Dr. Collins for whom the plaintiffs sought permission from the DHHS to depose, Dr. Varmus, has not been employed by the DHHS for five years. (Pl.s' Reply Mem. Supp. Mot. at 8). Likewise, the DHHS's characterization of the testimony sought from Dr. Collins-the undisputed principal negotiator for the HGP at the meeting in question who devoted a significant amount of both his and the government's time engaging in talks with Celera-as merely "helpful" is an understatement. While potential disruption is certainly a legitimate concern for the DHHS, such exaggerations and unsupported assertions cause the court to doubt the validity of that concern here.

Finally, the plaintiffs are required under 45 C.F.R. § 2.4(a) to state why the testimony sought would be in the interest of the DHHS or the federal government. The initial July 15, 2004 request to Dr. Zerhouni described the federal government's interest in the defendants' alleged issuance of false and misleading offering materials in violation of federal securities laws and the resulting sharp drop in the value of Celera stock. (Fournier Aff., 10/12/04, Ex. B at 2). Nevertheless, Dr. Kingston denied the plaintiffs' request on August 6, 2004 for "fail[ure] to demonstrate how Dr. Collins' testimony will promote the objectives of the [DHHS.]" (Fournier Aff., 10/12/04, Ex. C at 1). Dr. Kingston restated this conclusory rationale in his denial of the plaintiffs' request for reconsideration. (Fournier Aff., 10/12/04, Ex. F at 1). The DHHS's own Touhy regulations, however, stipulate that the party seeking testimony must give "reasons why the testimony would be in the interest of the DHHS *or the federal government.*" 45 C.F.R. § 2.4(a) (emphasis added). Thus, the plaintiffs can satisfy the last element of the Touhy regulations by showing that the testimony sought will further the interest of the federal government, if not the DHHS directly.

The DHHS's refusal to produce Dr. Collins is based in part on its view of this case as merely a "private matter between the parties" in which the federal government has, at most, a nominal interest. (Fournier Aff., 10/12/04, Ex. C at 1; Ex. F at 1). The court, however, takes a more weighty view of the government interest served by shareholder class actions. "While it is certainly true that these actions involve claims by shareholders [ ], all private citizens, for large losses they have incurred, it is also true that the interests they seek to vindicate are those that Congress has regarded as very much in the federal public interest." *In re United States Bioscience Sec. Litig.,* 150 F.R.D. 80, 82 (E.D.Pa.1993). FN3 Faced with an almost identical situation in *Bioscience,* the district court compelled

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 6
Slip Copy, 2005 WL 806719
**(Cite as: Slip Copy)**

the depositions of three Food and Drug Administration employees who possessed evidence relevant to securities laws violations and who were " the only independent sources for discovery and evidence" on issues crucial to the litigation. *Id.* The *Bioscience* court explained its reasoning as follows:

> FN3. "Moreover, [the Supreme Court] repeatedly ha[s] emphasized that implied private actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [Securities and Exchange] Commission action.' " *Bioscience,* 150 F.R.D. at 82 (citing *Bateman Eichler, Hill, Richards, Inc. v. Berner,* 472 U.S. 299, 310 (1985)).

*6 The Bioscience representatives who were part of communications with these three FDA employees have told, or will tell, their story in depositions and at trial. In order to confirm the completeness and truthfulness of those accounts, the only possible test available to plaintiffs is to depose the FDA participants in those interchanges.*Id.* Likewise, here Dr. Collins is being called as a fact witness because he was the lead representative of the HGP who was involved in all phases of the negotiations with the defendants, including the December 29 meeting, and therefore the best witness to test the accounts of the defendants' witnesses. Thus, while the federal government's interest lie in its agencies operating efficiently with as few disruptions as possible, as the DHHS points out, "[that interest] also includes the Congressionally-mandated assurance of the integrity of the public securities markets that are so crucial to the nation's economic well-being. This issue is most assuredly involved here." *Id.*

**B.**

The DHHS further argues that the APA, 5 U.S.C. § 706(2)(A), provides the appropriate standard of review to be applied on this motion, which it contends is "whether the [DHHS's] action in not authorizing the testimony of Dr. Collins was ' arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' " (Mem. Opp'n Mot. to Compel at 5), relying on the Second Circuit's opinion in *United States Envtl. Prot. Agency v. General Electric Co.,* 212 F.3d 689 (2d Cir.2000) ("GE II"). In *GE II,* however, the Second Circuit expressly declined to decide whether the APA's standard of review should govern the district court's evaluation of the Environmental Protection Agency's refusal to comply with the third-party subpoena at issue, specifically noting that "a plausible argument can be made in support of the idea that Section 706 of the APA is not necessarily the appropriate standard of review." *Id.* at 690. More recently, the Second Circuit held that "the question of whether APA § 706 governs courts' review of agency non-compliance with discovery requests-[is] a question which is, in any event, *far from settled.*" *Semon v. Stewart,* 374 F.3d 184, 192 (2d Cir.2004) (emphasis added). The court observed that "some of our sister circuits have affirmatively held that APA § 706 does not apply to motions to compel agency compliance with subpoenas." *Id.* at 191 (citing *Exxon Shipping Co. v. United States Dep't of Interior,* 34 F.3d 774, 778-79 (9th Cir.1994) ; *Linder v. Calero-Portocarrero,* 251 F.3d 178, 180-81 (D.C.Cir.2001)). In *Exxon,* the Ninth Circuit stated:

> We acknowledge the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations. However, we are confident that district courts can, and will, balance the government's concerns under the general rules of discovery. The Federal Rules of Civil Procedure explicitly provide for limitations on discovery in cases such as this. Rule 26(c) and Rule 45(c)(3) give ample discretion to district courts to quash or modify subpoenas causing " undue burden."

*7 *Id.* at 779. Accordingly, on this motion, the court need only balance the plaintiffs' right to obtain relevant evidence pursuant to the applicable federal discovery rules against the government's concerns regarding the potential disruption of Dr. Collins's official duties.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 7

Slip Copy, 2005 WL 806719
**(Cite as: Slip Copy)**

[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.
Fed.R.Civ.P. 26(b)(1). Information that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery. *See Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991) ; *Morse/Diesel, Inc. v. Fidelity & Deposit Co.,* 122 F.R.D. 447, 449 (S.D.N.Y.1988).

A party may object to a request if it is "overly broad " or "unduly burdensome." Charles A. Wright, et al., 8A Federal Practice & Procedure § 2174, at 297 (2d ed.1994). To assert a proper objection on this basis, however, one must do more than "simply intone [the] familiar litany that the interrogatories are burdensome, oppressive or overly broad. *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 42 (S.D.N.Y.1984). Instead, the objecting party bears the burden of demonstrating " specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Id.* (internal citations and quotation marks omitted). *See also Hickman v. Taylor,* 329 U.S. 495, 507 (1947) (stating that "the deposition-discovery rules are to be accorded a broad and liberal treatment").

If a party resists or objects to discovery, Rule 37(a) of the Federal Rules of Civil Procedure provides that the other party, "upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling disclosure or discovery...." Fed.R.Civ.P. 37(a). The defendant, as the objecting party, bears the burden of showing why discovery should be denied. *Blakenship v. Hearst Corp.,* 519 F.2d 418, 429 (9th Cir.1975). Moreover, the court is afforded broad discretion in deciding discovery issues. *See Wills v. Amerada Hess Corp.,* 379 F.3d 32, 41 (2d Cir.2004).

For all of the aforementioned reasons, the relevance of Dr. Collins's testimony in this shareholder action weighs in favor of allowing his deposition. The DHHS's *pro forma* denials and subsequent arguments on this motion have not satisfied its burden of showing how allowing Dr. Collins to testify would be an "undue burden" on him or the government. *See* Fed.R.Civ.P. 26(c) & 45(c)(3)(A)(iv).

C.

**\*8** The defendants oppose the plaintiffs' motion as untimely, arguing that they "could have taken steps to secure the testimony of Dr. Collins prior to October 12, 2004, eight days before the current fact discovery cut-off." (Defs.' Resp. & Partial Opp'n at 6). However, Dr. Collins was first served with a subpoena on July 2, 2004, over three months prior to the discovery deadline. From the time the subpoena was served, the plaintiffs worked to comply with the DHHS's Touhy regulations and sought to resolve this issue without the court's intervention. Furthermore, the plaintiffs filed this motion prior to the discovery cut-off and moved the court to extend the deadline solely for the purpose of deposing Dr. Collins. The plaintiffs' motion is therefore timely and the defendants' argument is without merit. *See* Fed.R.Civ.P. 26(b)(2)(ii).

The defendants' also oppose the plaintiffs' motion on the ground that it seeks unnecessary and duplicative testimony, pointing out that the plaintiffs have already deposed six of the eight attendees at the meeting in question, including Drs. Waterston and Varmus from the HGP side, and obtained extensive document production from the HGP participants, including substantial communications and notes prepared by Dr. Collins. ( *Id.* at 8). The court is unpersuaded by this argument as well, having already mentioned the deference

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 8

Slip Copy, 2005 WL 806719
**(Cite as: Slip Copy)**

shown to Dr. Collins regarding questions on the specifics of the meeting in question, and how Dr. Collins, as the principal negotiator for the HGP, coordinated virtually every aspect of the negotiations with Celera and was the most knowledgeable person on the HGP side of the talks. Requiring Dr. Collins to be deposed is therefore not "unreasonably cumulative or duplicative." *See* Fed.R.Civ.P. 26(b)(2)(i).

Under Rule 30 of the Federal Rules of Civil Procedure, "[u]nless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day of seven hours." Fed.R.Civ.P. 30(d)(2). To minimize the disruption to the DHHS, the plaintiffs offered to limit the scope and duration of Dr. Collins's deposition. (Fournier Aff., 10/12/04, Ex. E at 1-2). The defendants, however, request that the court reject any temporal and subject matter limitations in the event the plaintiffs' motion is granted so that they may have a full and fair opportunity to cross-examine Dr. Collins. (Defs.' Resp. & Partial Opp'n at 10). If the defendants are not given such an opportunity, Dr. Collins's testimony will be deemed inadmissible hearsay at trial. Fed.R.Civ.P. 804(b)(1); *Cury v. Philip Morris USA,* 1995 U.S. Dist. LEXIS 14798, at *3 (S .D.N.Y. Oct 6, 1995). The court therefore orders the DHHS to produce Dr. Collins for a full deposition pursuant to Rule 30 within forty-five days of the date of this ruling.

For the foregoing reasons, the plaintiffs' motion to compel is **GRANTED.** This is not a recommended ruling. This is a discovery ruling and order reviewable pursuant to the "clearly erroneous" standard of review. 28 U.S.C. § 636(b)(1)(A) ; Fed.R.Civ.P. 6(a), (e) and 72(a); and Rule 2 of the Local Rules for U.S. Magistrate Judges. As such, it is an order of the court unless modified by the district judge upon motion timely made. *See* 28 U.S.C. § 636(b) (written objections to ruling must be filed within ten days after service of same).

*9 **IT IS SO ORDERED.**

D.Conn.,2005.
In re PE Corp. Securities Litigation
Slip Copy, 2005 WL 806719

Briefs and Other Related Documents (Back to top)

• 3:00cv00705 (Docket) (Apr. 19, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.